## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| RATNA BAGWE,<br><br>      Plaintiff,<br><br>v.<br><br>SEDGWICK CLAIMS MANAGEMENT<br>SERVICES, INC., TAMMY LECLAIRE and<br>ANGELA PAPAIOANNOU,<br><br>      Defendants. | Case No. 11-CV-02450<br><br>Magistrate Judge Young B. Kim<br><br>**Jury Trial Demanded** |

**DEFENDANTS SEDGWICK CLAIMS MANAGEMENT SERVICES, INC.'S, TAMMY
LECLAIRE'S AND ANGELA PAPAIOANNOU'S MEMORANDUM
OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

I.     **INTRODUCTION AND SUMMARY OF FACTS**      **1**

II.     **ARGUMENT**      **5**

    *A.*    *Some of Plaintiff's Claims Must be Dismissed as a Matter of Law*      8

    *B.*    *Plaintiff's Pattern and Practice Claim Must Fail*      10

    *C.*    *There Is No Direct or Circumstantial Evidence of Discrimination Based on Race or National Origin, or of Retaliation.*      11

    *D.*    *Plaintiff Cannot Establish an Indirect Method Prima Facie Case of Discrimination Based on Race or Gender, or Retaliation.*      17

        1. Most of Plaintiff's Discrimination and Retaliation Claims Fail because They Are Not Actionable Adverse Actions Even if They Occurred.      17

        2. Plaintiff's Protected Activity.      18

        3. Plaintiff Did Not Meet Defendants' Legitimate and Reasonable Employment Expectations.      18

        4. Plaintiff Cannot Show that a Single Similarly-Situated Employee Was Treated More Favorably.      19

        5. Plaintiff Cannot Show that Defendants" Rationale for Its Actions Was a Pretext for Discrimination or Retaliation.      21

    *E.*    *Plaintiff's Defamation Claims Fail as a Matter of Law.*      23

    *F.*    *To the extent she even brings one, Plaintiff's harassment claim must fail.*      24

III.    **CONCLUSION**      **25**

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Adams v. Wal-Mart Stores, Inc.,*
    324 F.3d 935 (7th Cir. 2003) .................................................................................. 16

*Argyropoulos v. City of Alton,*
    539 F.3d 724 (7th Cir. 2008) ............................................................................ 11, 12

*Brown v. Ill. Dep't of Natural Res.,*
    499 F.3d 675 (7th Cir. 2007) .................................................................................. 24

*Burlington N. & Santa Fe Railway Co. v. White,*
    548 U.S. 53 (2006) .................................................................................................. 12

*Caskey v. Colgate-Palmolive Co.,*
    535 F.3d 585 (7th Cir. 2008) .................................................................................. 24

*Cerutti v. BASF Corp.,*
    349 F.3d 1055 (7th Cir.2003) ................................................................................. 19

*Davenport v. Northrop Grumman Sys. Corp.,*
    281 Fed. Appx. 585 (7th Cir. 2008) ....................................................................... 11

*Durkin v. City of Chicago,*
    199 F. Supp. 2d 836 (N.D. Ill. 2002) ..................................................................... 29

*Filipovic v. K & R Express Sys., Inc.,*
    176 F.3d a390 (7th Cir.1999) ................................................................................. 14

*Forrester v. Rauland-Borg Corp.,*
    453 F.3d 416 (7th Cir. 2006) ............................................................................ 11, 26

*Frederick v. Henderson,*
    232 F. Supp. 2d 901 (N.D. Ill. 2002) ..................................................................... 24

*Hammel v. Eau Galle Cheese Factory,*
    407 F.3d 852 (7th Cir. 2005) .................................................................................. 30

*Haywood v. Lucent Technologies, Inc.,*
    323 F. 3d 524 .......................................................................................................... 28

*Kulumani v. Blue Cross Blue Shield Ass'n,*
    224 F.3d 681 (7th Cir. 2000) ............................................................................ 11, 26

iii

*Luckie v. Ameritech Corp.*,
   389 F.3d 708 (7th Cir. 2004) ............................................................................ 11

*Maxon v. Ottawa Pub. Co.*,
   929 NE 2d 666 (3rd Dist. 2010) ................................................................. 12, 13

*McDonnell Douglas Corp. v. Green*,
   411 U.S. 792 (1973) ........................................................................................ 10

*Moore v. PETA*,
   932 NE 2d 448 (1st Dist. 2010) ........................................................................ 13

*Nichols v. S. Ill. Univ.*,
   510 F.3d 772 (7th Cir. 2007) ...................................................................... 10, 20

*Olson v. N. FS, Inc.*,
   387 F.3d 632 (7th Cir. 2004) ........................................................................... 18

*Perry v. Harris Chernin, Inc.*,
   126 F.3d 1010 (7th Cir. 1997) ......................................................................... 29

*Pourghoraishi v. Flying J, Inc.*,
   449 F. 3d 751 (7th Cir. 2006) .......................................................................... 13

*Ptasznik v. St. Joseph Hosp.*,
   464 F.3d 691 (7th Cir. 2006) ...................................................... 11, 16, 19, 26

*Puffer v. Allstate Ins. Co.*,
   675 F. 3d 709 (7th Cir. 2012) .......................................................................... 15

*Rayford v. Wexford Health Sources, Inc.*,
   400 Fed. Appx. 100 (7th Cir. 2010) ................................................................. 10

*Raymond v. Ameritech Corp.*,
   442 F.3d 600 (7th Cir. 2006) ........................................................................... 10

*Rogers v. City of Chicago*,
   320 F.3d 748 (7th Cir.2003) ............................................................................ 16

*Scaife v. Cook County*,
   446 F.3d 735 (7th Cir. 2006) ........................................................................... 12

*Smart v. Ball State Univ.*,
   89 F.3d 437 (7th Cir. 1996) ............................................................................. 19

*Springer v. Durflinger*,
   518 F.3d 479 (7th Cir. 2008) ........................................................................... 10

*Stone v. City of Indianapolis Public Utils. Div.*,
    281 F.3d 640 (7th Cir. 2002) ............................................................................... 12

*Von Zuckerstein v. Argonne Nat. Laboratory*,
    984 F. 2d 1467 (7th Cir. 1993) (Title VII and § 1981 claims analyzed in the same
    way) ..............................................................................................................10, 13

*Williams v. Waste Mgmt. of Ill., Inc.*,
    361 F.3d 1021 (7th Cir. 2004) .............................................................................. 29

*Winsley v. Cook County*,
    563 F.3d 598 (7th Cir. 2009) ................................................................................ 11

*Wyninger v. New Venture Gear, Inc.*,
    361 F.3d 965 (7th Cir. 2004) ................................................................................ 24

*Wynne v. Loyola Univ. of Chicago*,
    318 Ill.App.3d 443 (3rd Dist. 2000) ...................................................................... 28

## STATUTES

735 ILCS 5/13-201 ...................................................................................................... 13

Defendants Sedgwick Claims Management, Inc. ("Sedgwick"), Tammy LeClaire ("LeClaire") and Angela Papaioannou ("Papaioannou") (collectively, "Defendants"), through their attorneys, Monica H. Khetarpal and Paul J. Stroka of Jackson Lewis, P.C., submit the following memorandum of law in support of Defendants Sedgwick Claims Management, Inc.'s, Tammy LeClaire's, and Angela Papaioannou's Motion for Summary Judgment.

## I.     INTRODUCTION AND SUMMARY OF FACTS

Plaintiff Ratna Bagwe ("Bagwe" or "Plaintiff"), whose race and national origin are Indian, was employed by Sedgwick in its Chicago office from 2001 until her termination on August 13, 2009. Throughout her employment, Plaintiff worked on the company's AT&T account. (SOF ¶ 3). She reported to Operations Manager Delaine Simmons (African-American) until October 2007, and Program Manager Angela Papaioannou (Greek American) thereafter, both of whom reported to Managing Director Tammy LeClaire (White American). (SOF ¶ 11, 15). Plaintiff considers Simmons a mentor, role model, person of integrity and someone who "would not be racially biased." (SOF[1] ¶ 27).

In January 2005, Simmons promoted Plaintiff to Assistant Manager II. (SOF ¶ 12). Between February and September 2007, Plaintiff functioned as the interim operations manager while Simmons worked in California on a special project. (SOF ¶ 13). After Simmons returned to Chicago, she discovered significant issues with Plaintiff's performance. (SOF ¶ 13-14).

In late 2007 and early 2008, Sedgwick restructured the AT&T account. Simmons was promoted to work on a different account, and a Program Manager position was created between Operations Manager and Managing Director. Papaioannou was made the Area Manager overseeing the AT&T account. She reported to LeClaire, who oversaw multiple accounts. (SOF ¶ 8).

In September 2007, LeClaire promoted Plaintiff to Operations Manager III, despite Simmons' concerns. (SOF ¶ 15). Plaintiff received an 11% promotional increase in 2007, and another $3,000

---

[1] Defendant's Rule 56.1 Statement of Undisputed Material Facts is cited as "SOF".

merit increase seven months later. *Id.*

In April 2008, Plaintiff complained that she did not receive a promotional pay increase when she was promoted in January 2005, and also that she should have received a bigger raise in 2008. (SOF ¶ 16-19). None of her supervisors believed this complaint was based on Plaintiff's race or national origin. (SOF ¶ 20). She claimed Simmons had promised[2] her the 2005 promotional increase in accordance with "company policy," but did not deliver because LeClaire had somehow interfered. (SOF ¶ 22). Simmons, Plaintiff's self-described mentor, testified that she did not give Plaintiff the increase because her compensation was already in line with her new position and her promotion was more of a title change. (SOF ¶ 18). Simmons felt that Plaintiff's allegations against her were "unprofessional and offensive," and she even filed a complaint with Colleague Resources ("CR") (Sedgwick's term for human resources). LeClaire later convinced Simmons out of pursuing this complaint, but she felt that the fact that Plaintiff waited over three years to raise the issue reflected negatively on her and her leadership skills. (SOF ¶ 24, 26).

Beginning in early 2008 and until her termination, LeClaire and Papaioannou became concerned because Plaintiff's leadership and communication skills were deficient in a number of ways. (SOF ¶ 22, 25-27). Plaintiff reacted defensively to constructive criticism, often changing the subject to other colleagues' performance or disciplinary issues. She also engaged in unnecessarily confrontational "email wars" with her colleagues. (SOF ¶ 28-39). LeClaire, who had promoted Plaintiff just months earlier, wanted her to succeed in her new position, so she repeatedly tried to coach Plaintiff on these issues to no avail. (SOF ¶ 28-29). Charles French, with whom Plaintiff had a dotted line reporting relationship, also told LeClaire and Papaioannou that he had observed numerous ongoing operational, communication and leadership issues. (SOF ¶ 9). Papaioannou not only personally experienced

---

[2] In 2008, Plaintiff alleged Simmons had "promised" her a promotional increase but during her deposition, she specifically denied that Simmons had promised her anything. SOF ¶ 23.

Plaintiff's email wars, but she was also aware that others had complained about her communication and leadership issues. (SOF ¶ 33-39). Similarly, Tonya Warner (African-American), one of Plaintiff's subordinates, had such strained communications with Plaintiff that in early April 2008, she was reassigned to Papaioannou as her primary supervisor. (SOF ¶ 33, 55-58).

Because of these ongoing issues, on March 12, 2009 Plaintiff was issued a Performance Improvement Plan ("PIP"). The PIP was specifically designed as a tool to help her improve her performance and did not affect her compensation, job duties or title. (SOF ¶ 40-44). On April 1, 2009, Plaintiff presented Papaioannou, LeClaire and Carla Street, the CR representative in the Chicago office, with a detailed response to the PIP, including an eighteen-page memorandum and binder full of supporting materials. (SOF ¶ 45). Street, Papaioannou and LeClaire reviewed the response, but decided that the PIP would stand. (SOF ¶ 46-47). Plaintiff's PIP response did not allege race or national origin discrimination, did not alleged that the PIP was retaliatory. (SOF ¶ 45).

On April 3, 2009, Plaintiff filed a complaint with CR regarding various compensation issues, Tonya Warner's reassignment, and inappropriate behavior and remarks allegedly made by French and one of his subordinates, Anne Coyle. (SOF ¶ 50-65, 69-71). On May 1, 2009 Plaintiff made a second complaint to Carla Street regarding another inappropriate remark allegedly made by Anne Coyle. (SOF ¶ 66-68). Nearly all of Plaintiff's complaints involved incidents or decisions that occurred *years* prior. (SOF ¶ 50-71).Simpson and Street conducted thorough investigations into the respective complaints, including interviewing multiple witnesses, neither found any evidence of EEO policy violations. *Id.*

Plaintiff's communications with Papaioannou improved in early summer 2009. (SOF ¶ 82). However, she continued to engage in "email wars" with her colleagues. (SOF ¶ 83-91). On July 16, 2009, Warner, who was very upset at the time, complained to Simmons and LeClaire that Plaintiff had been harassing her on an ongoing basis. (SOF ¶ 84-86). LeClaire spoke to Papaioannou when she

returned from Greece, who in turn spoke to Plaintiff about the incident. (SOF ¶ 87-88). Although Papaioannou felt that Plaintiff had followed her recommendations for dealing with interpersonal issues, she also believed Plaintiff should have approached LeClaire for assistance. (SOF ¶ 88). Papaioannou interviewed other members of Plaintiff's team who confirmed an ongoing problem with Plaintiff's communications. (SOF ¶ 89-91). Based on their respective observations over the course of the prior two years, LeClaire and Papaioannou each concluded that Plaintiff's communication and leadership issues would not improve over the long run, and that she should therefore be terminated. (SOF ¶ 92-94). This decision was reviewed and approved by LeClaire's supervisor and the Director of Colleague Resources. (SOF ¶ 96-98). Plaintiff was terminated on August 13, 2009. (SOF ¶ 3). She later claimed that earlier that day, she heard Papaioannou mutter "Indian bitch" just after she had exited Papaioannou's office. (SOF ¶ 102).

Five days after her termination, Plaintiff sent Sedgwick an email complaining about discrimination, harassment and retaliation. Sedgwick attempted to obtain more information from Plaintiff to investigate these allegations, but because Plaintiff was not responsive to their requests, the investigation was closed on October 13, 2009. (SOF ¶ 103-104).

Gary Enneking (White American) was hired to replace Plaintiff, but was terminated approximately a year later due to performance deficiencies similar to Plaintiff's. (SOF ¶ 105). Tonya Warner replaced Enneking and currently holds the position. *Id.*

Plaintiff claims that LeClaire, Papaioannou and perhaps other Sedgwick employees provided negative references to prospective employers after her termination. (SOF ¶ 107-110). Plaintiff has not offered even speculative evidence of what exactly was said about her, to whom and when. *Id.* Nevertheless, Plaintiff was employed by at least three separate companies since leaving Sedgwick. (SOF ¶106). She was terminated by the first two due to similar communications and leadership issues

that lead to her termination at Sedgwick, and her position as eliminated at the third. *Id.*

On April 12, 2011, Plaintiff filed the ten-count complaint at issue here, alleging race and national origin discrimination and retaliation under § 1981, Title VII, the Illinois Human Rights Act, and state law defamation. For all the reasons stated below, this Court should grant summary judgment as to each of Plaintiff's claims.

## II.   ARGUMENT

Summary judgment is appropriate if the evidence of record "show[s] that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In this case, Plaintiff has created an enormous record. The depositions occurred nearly five years after the complained-of events. Due to the volume of Plaintiff's complaints, the number of witnesses involved and the significant delay between the alleged events and this lawsuit, issues of fact are simply unavoidable. However, there are no *material* issues of fact here. At this stage, Plaintiff must "do more than simply show that there is some metaphysical doubt as to the material facts" – she cannot rely on speculation or hunches to "manufacture a genuine issue of fact." *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008). She also cannot rely on immaterial inconsistencies in the record. Rather, must proffer *actual evidence* of intentional discrimination.  *Rayford v. Wexford Health Sources, Inc.*, 400 Fed. Appx. 100, 104 (7th Cir. 2010).

Plaintiff may establish her race or national origin discrimination claims under § 1981, Title VII and Illinois Human Right Act ("IHRA") by using the direct or indirect method of proof.  *See Raymond v. Ameritech Corp.*, 442 F.3d 600, 610 (7th Cir. 2006).[3] The direct method requires facts that would

---

[3] Claims brought under § 1981, Title VII and the IHRA are all analyzed under the same rubric. A plaintiff may survive summary judgment under any of the three by either using the direct method of proof or the indirect burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Von Zuckerstein v. Argonne Nat. Laboratory*, 984 F. 2d 1467, 1472 (7th Cir. 1993) (Title VII and § 1981 claims analyzed in the same way); *Zaderaka v. Ill. Human Rights Comm'n*, 131 Ill.2d 172, 179 (1989) (Title VII and IHRA claims analyzed in the same way).

permit a direct inference to be drawn that Plaintiff's race or national origin motivated Defendants' to subject her to the disparate treatment she alleges. *Id.* Plaintiff would also have to prove she was subjected to disparate treatment and that the incidents were "materially adverse employment action[s]." *Nichols v. S. Ill. Univ.*, 510 F.3d 772, 779 (7th Cir. 2007).

Alternatively, Plaintiff could establish her race and national origin discrimination claims under the indirect method of proof governed by the *McDonnell Douglas* burden-shifting analysis:

> A plaintiff can establish a racial discrimination claim under Title VII in two ways. Under the "direct method," she must present direct or circumstantial evidence that creates a "convincing mosaic of discrimination" on the basis of race. [Citation omitted.] Under the indirect method, she must establish a prima facie case of discrimination by presenting evidence that: (1) she is a member of a protected class, (2) her job performance was meeting her employer's legitimate expectations, (3) she was subject to a materially adverse employment action, and (4) the employer treated similarly situated employees outside the protected class more favorably.

*Winsley v. Cook County*, 563 F.3d 598, 604 (7th Cir. 2009). If Plaintiff succeeds in establishing a *prima facie* case of discrimination:

> [T]hen the burden shifts to the defendant[] to rebut the *prima facie* case by articulating a legitimate, nondiscriminatory reason for terminating her . . . . Once the defendant[ ] articulate[s] a legitimate reason for termination, the burden then shifts back to [the plaintiff] to prove that the stated reason for her termination is pretextual.

*Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 696 (7th Cir. 2006) (citation omitted). In order to establish pretext, Plaintiff must show that Defendants' reasons for its actions are deliberately false, because "pretext means a dishonest explanation, a lie rather than an oddity or an error. A pretext . . . is a deliberate falsehood." *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir. 2000); *Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 419 (7th Cir. 2006).

Plaintiff's retaliation claim follows a similar analysis[4]. She may proceed under the direct method by presenting evidence showing that: "(1) she engaged in statutorily protected activity; (2) she

6

suffered a materially adverse action; and (3) a causal connection exists between the two." *Argyropoulos v. City of Alton*, 539 F.3d 724, 733 (7th Cir. 2008).

As for the causation prong, Plaintiff must prove that the decision-maker behind the alleged actions knew she engaged in statutorily protected activity, "otherwise no retaliatory motive can be ascribed to" Defendants'. *Davenport v. Northrop Grumman Sys. Corp.*, 281 Fed. Appx. 585, 587 (7th Cir. 2008); *see also Luckie v. Ameritech Corp.*, 389 F.3d 708, 715 (7th Cir. 2004) ("[i]t is not sufficient that [the decisionmaker] *could* or even *should* have known about [the plaintiff's] complaints") (emphasis in original). That an adverse employment action may have followed "close on the heels" of protected expression, will "rarely be sufficient in and of itself to create a triable issue." *Stone v. City of Indianapolis Public Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002). Rather, close temporal proximity may permit a plaintiff to survive summary judgment only if there also is *other* evidence that supports the inference of a causal link. *Scaife v. Cook County*, 446 F.3d 735, 742 (7th Cir. 2006).

To establish the alleged actions were "materially adverse," Plaintiff "must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Railway Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotations omitted). However, Plaintiff's decision to report allegedly discriminatory and harassing behavior "cannot immunize [her] from those petty slights or minor annoyances that often take place at work and that all employees experience." *Id.*

Plaintiff may also proceed with her retaliation claim under the indirect method by establishing that: "(1) she engaged in statutorily protected activity; (2) she suffered a materially adverse action; (3) she met her employer's legitimate expectations and (4) she was treated less favorably than a similarly situated employee who did not engage in statutorily protected activity." *Argyropoulos*, 539 F.3d at 733.

Finally, Plaintiff must prove her state law defamation claims against Papaioannou and LeClaire by showing: "(1) a defendant made a false statement concerning the plaintiff; (2) there was an unprivileged publication of the defamatory statement to a third party by the defendant; and (3) plaintiff was damaged." *Maxon v. Ottawa Pub. Co.*, 929 NE 2d 666, 767-77 (3rd Dist. 2010). "Statements can be either defamatory *per quod* (requiring extrinsic facts to explain the defamatory character of the statements) or defamatory *per se* (obviously and naturally harmful to a person)." *Id.* With respect to *per se* defamation, Plaintiff must establish, " words that impute an inability to perform or want of integrity in the discharge of duties of office of employment; [or]…words that prejudice a party, or impute a lack of ability, in his or her trade, profession, or business." *Id.*

### A. Some of Plaintiff's Claims Must be Dismissed as a Matter of Law

First, Plaintiff alleges both race and national origin discrimination under § 1981. However, "Section 1981 applies to allegations of discrimination based on race but not national origin." *Pourghoraishi v. Flying J, Inc.*, 449 F. 3d 751, 756, (7th Cir. 2006). *See also, Von Zuckerstein*, 984 F. 2d at 1472 (stating discrimination based on being "foreign born" is not actionable under § 1981). Therefore, Plaintiff's claims of discrimination because she was born in India, and retaliation for complaining about the same, in Counts 1-3 of her Complaint must be dismissed. This conclusion has two notable consequences. First, Count 2, which claims that Plaintiff was terminated due to discrimination based only on national origin in violation of § 1981 must be dismissed in its entirety. Second, LeClaire and Papaioannou are not named in Counts 4, 5, 7 or 8, which are the only remaining counts alleging national origin discrimination. Therefore, Plaintiff has only properly alleged against Papaioannou and LeClaire: (1) discrimination in the terms of conditions of Plaintiff's employment (not termination) based on race under § 1981 (Count 1), (2) retaliation for complaining about race discrimination under § 1981 (Count 3), and (3) defamation (Count 10).

Second, in Illinois, the statute of limitations for defamation is one year. 735 ILCS 5/13-201. The statute of limitations begins to run on the date of publication of the defamatory material. *Moore v. PETA*, 932 NE 2d 448, 459 (1st Dist. 2010). Plaintiff filed the present lawsuit on April 12, 2011. Therefore, any allegedly defamatory statements that were published prior to April 12, 2010 are outside the statute of limitations in this matter and must be dismissed. Plaintiff's Complaint states that "internal corporate communications constitute publications." Compliant ¶114. Presumably, this means that Plaintiff alleges that statements that were made internally at Sedgwick are defamatory. Although she fails to specifically state which corporate communications are defamatory, her failure to do so does not matter. Plaintiff was terminated in August 2009, this lawsuit was filed April 12, 2011 and there is no evidence that anyone at Sedgwick talked about her internally after she left. Therefore, even if there were defamatory "internal corporate communications," which Defendants deny, they would be outside the statute of limitations and cannot give rise to liability. Plaintiff also alleges that LeClaire and Papaioannou made defamatory statements to potential employers. (SOF ¶107-110). However, with the exception of a single LinkedIn communication from 2011 that contains nothing but hearsay, Plaintiff has not presented any evidence whatsoever about *when* any such communications took place. Ultimately, Plaintiff has the burden to prove her case at all points in the litigation. *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 538 (7th Cir. 2007). Therefore if Plaintiff cannot provide admissible evidence that any given allegedly defamatory remark occurred within the limitations period, her allegations regarding the remark must be dismissed.[5]

Third, many of Plaintiff's allegations must be dismissed because they fall outside the 300-day

---

[5] During her deposition, Plaintiff claimed she was in possession of LinkedIn and email communications which evidence the allegedly defamatory statements, and presumably the dates of those statements. Those documents are responsive to Plaintiff's discovery requests, which were propounded nearly *two and a half years ago*. Plaintiff's counsel has repeatedly assured Defendants' counsel that either the documents in question, or an explanation as to why the documents no longer exist, would be forthcoming. However, to date, Defendants' counsel has received neither. This matter will be the subject of a separately-filed motion seeking discovery sanctions against Plaintiff for failure to disclose or preserve the documents in question.

window to file a charge of discrimination, and Plaintiff has therefore failed to exhaust her administrative remedies for those allegations. *Filipovic v. K & R Express Sys., Inc.*, 176 F.3d 390, 395 (7th Cir.1999). Plaintiff's claims under the IHRA and Title VII that precede approximately March 19, 2009 are untimely, because Plaintiff filed her Charge on December 12, 2009. This is particularly true of her complaints about her compensation in 2005 and 2007, because she has no colorable argument they are "'related closely enough to the acts occurring within the established time frame 'to be considered one ongoing violation.'" *Id.* at 396. Plaintiff's 2005 and 2007 compensation was set by Delaine Simmons, who had not been her manager for nearly a year and a half by the time of the March 19, 2009 deadline. Therefore, at a minimum to the extent the claims were brought under Title VII and the IHRA, they must be dismissed.

Finally, with respect to Plaintiff's § 1981 claims, any events occurring prior to April 12, 2007, (e.g. Plaintiff's complaint about the 2005 promotional increase), are barred by the statute of limitations codified in 28 U.S.C. § 1658. *Dandy v. United Parcel Service, Inc.*, 388 F. 3d 263, 269 (7th Cir. 2004).

### B.     Plaintiff's Pattern and Practice Claim Must Fail

"Pattern-or-practice claims require a 'showing that an employer regularly and purposefully discriminates against a protected group.' [citation omitted.] Plaintiffs must prove that discrimination 'was the company's standard operating procedure— the regular rather than the unusual practice.' [citation omitted.]" *Puffer v. Allstate Ins. Co.*, 675 F. 3d 709, 716 (7th Cir. 2012). Plaintiff cannot possibly meet this burden here. First, there is ample evidence of individuals within Plaintiff's protected class[6] who were promoted and, according to Plaintiff, treated more favorably than she was. For example, Plaintiff claims that Tonya Warner (African-American), was treated more favorably than Plaintiff because she was removed from Plaintiff's supervision when she took issue with her leadership

---

[6] Because Plaintiff has testified that Defendants discriminated against non-Whites and non-Americans, as opposed to just Indians, the protected class includes all non-Whites and non-Americans. (SOF ¶ 3).

style and was not disciplined after the July 2009 incident, whereas Plaintiff was not reassigned from Papaioannou. (SOF ¶ 55-58). Warner has been promoted since Plaintiff's termination and now actually holds Plaintiff's position. (SOF ¶ 105). Delaine Simmons, (African-American), was Plaintiff's supervisor and has since been promoted further. (SOF ¶ 8). Angela Papaioannou, (Greek American), was Plaintiff's supervisor and is allegedly one of her discriminators, and has also been promoted. (SOF ¶ 5). Rich Hernandez (Italian and Puerto Rican) and Rose Ramos (Mexican), testified that they have never felt discriminated against, harassed or retaliated against while employed by Sedgwick. (SOF ¶ 66). Plaintiff's attempts at identifying other individuals within her protected class who were also treated poorly are unavailing. She claims that certain individuals who she argues were treated better than her due to their race, such as Tonya Warner, were also discriminated against based on their race. (*See* Exhibit O, Plaintiff's Dep., Ex. 5, p. 32-33). Plaintiff cannot have it both ways. She also claims that the "less favorable" treatment received by some consisted of minor things which cannot survive summary judgment, such as "nit-picking" and not being allowed to work from home.

### C. There Is No Direct or Circumstantial Evidence of Discrimination Based on Race or National Origin, or of Retaliation.

"Direct evidence 'essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus.'" *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir.2003) (citation omitted). There is no question that Plaintiff cannot present any direct evidence of discrimination in this matter. There are simply no smoking guns in this case. Therefore, in order to succeed under the direct method, Plaintiff must present "circumstantial evidence" of discrimination, which is often described as a "convincing mosaic" that "allows a jury to infer intentional discrimination by the decisionmaker." *Id.* However, Plaintiff cannot manufacture a "convincing mosaic" by the volume of evidence alone. Rather, "circumstantial evidence must point directly to a discriminatory reason for the termination decision." *Ptasznik*, 464 F.3d at 695; *Adams v. Wal-Mart Stores, Inc.*, 324

F.3d 935, 939 (7th Cir. 2003).

Here, Plaintiff raises a myriad of complaints but once the circumstances of each complaint are examined, it becomes evident that they cannot constitute circumstantial evidence of discrimination or retaliation either because they have entirely reasonable explanations, or because they do not constitute materially adverse employment actions.[7] For example, Plaintiff complains about not receiving a promotional increase in 2005, but she also admits that the person responsible for making that determination – Delaine Simmons – would never discriminate against her. (SOF ¶ 27). She attempts to argue that Simmons was influenced by LeClaire to deny her the increase but offers no evidence in support of her claim. There is also evidence that multiple White Americans were similarly promoted without promotional pay raises. (SOF ¶ 23). Plaintiff also complains about not receiving sufficient compensation for the interim operations manager position in 2007, but there is ample evidence that White American employees who performed two jobs for an interim period without any additional pay. (SOF ¶ 52). Unlike those employees, Plaintiff actually received $5,000 as a result of her complaints. (SOF ¶ 53). Plaintiff also complains about her 2008 pay raise and her compensation at that time relative to Paul Betz and Keith Lanier. Plaintiff argues that once geographic pay differentials are taken into account, she was paid less than Betz and Lanier. However, once *all* relevant factors were taken into account, such as experience, time in service, and the 3% budget for merit increases, her 2008 salary was equitable. (SOF ¶ 69). Plaintiff also complains that she was not promoted to the Operations Manager position for General Dynamics in 2005. In addition to the fact that Plaintiff never applied for the job, the position required operations and program management experience – Plaintiff had neither at

---

[7] In addition to the claims specifically discussed in greater detail, many of Plaintiff complaints are quite obviously not adverse actions under the applicable case law. For example, "not sending office wide announcement of [her] promotion to Operations Manager," delivering her PIP to her without a CR representative present, delivering her PIP and/or terminating her right before an office party, not allowing her to return to her office to personally retrieve her personal belongings and instead having them delivered to her, removing an award from her personnel file and not returning certain awards to her with her personal belongings. In the interest of brevity, Defendants will not address each of these allegations in detail, but rather argue that they simply are not adverse employment actions.

the time and Betz had both. (SOF ¶ 74). In other words, there is a reasonable explanation for all of these complaints, and therefore they are entirely unconvincing as circumstantial evidence of discrimination.

Plaintiff also complains about a number of allegedly offensive remarks. With respect to Coyle's comments about Plaintiff's "old Indian husband," Lanier's homosexuality, and her comments during the H1N1 virus meeting, even if these remarks were made,[8] they can only be construed as stray remarks which do not give rise to a discrimination claim. "An 'isolated comment or `stray remark' is typically insufficient to create an inference of discrimination, but it may suffice if it (1) was made by the decision-maker, (2) around the time of the decision, and (3) referred to the challenged employment action.'" *Shaikh v. Bd. of Trustees of Community College Dist. of Chicago No. 508*, Dist. Court, ND Illinois 2012, citing *Mach v. Will Cnty. Sheriff*, 580 F.3d 495, 499 (7th Cir. 2009). *See also Olson v. N. FS, Inc.*, 387 F.3d 632, 635 (7th Cir. 2004) ("A statement can be direct evidence of discriminatory intent where the statement is made around the time of and in reference to the adverse employment action."). Coyle's alleged statements are quintessential stray remarks; Coyle was not a decision-maker with respect to Plaintiff's employment, the alleged comments were not made anywhere near the time of Plaintiff's termination or PIP, and the remarks also quite obviously had nothing to do with Plaintiff, much less an employment action related to Plaintiff. (SOF ¶ 59-68). Despite the fact that she was Plaintiff's supervisor, LeClaire's alleged remark about her Indian sister-in-law is similarly stray.

The only alleged remark that deserves any analysis at all is Plaintiff's allegation that Papaioannou alleged muttered "Indian bitch" as Plaintiff was leaving her office on the day of her termination. (SOF ¶ 102). Although Papaioannou was a decision-maker to the extent that she weighed

---

[8] Defendants vehemently deny that Coyle, Papaioannou, or LeClaire made any remarks that were offensive to gays, Hispanics, Indians, or any other protected category of individuals. Tellingly, none of the individuals who were allegedly witnesses to these remarks corroborated Plaintiff's allegations. For purposes of summary judgment, Defendants will assume that the remarks as Plaintiff relates them were made. However, Defendants reserve the right to refute these allegations if this case proceeds to trial.

in on the termination decision, and the remark was made on the same day as Plaintiff's termination, there is no evidence that the remark referred to the challenged employment action. Plaintiff had simply stopped into Papaioannou's office to say hi, and the remark was allegedly made as she was leaving. Papaioannou did not participate in the termination discussion that day, and by all accounts, her role in the termination decision was over after she and LeClaire had decided to recommend termination to Johnson and Browne. Especially taking into account the fact that *none* of the other allegedly discriminatory remarks have any bearing on Plaintiff's employment, and the scant admissible evidence of racial animus elsewhere in the record, there can be no doubt that even if Papaioannou did make the remark in question, it was stray. In fact, this conclusion is supported by Seventh Circuit precedent, which has found that even an immediate supervisor's comments about an employee's race are insufficient to establish circumstantial evidence of discrimination if they are not related to the employment decision. *See Ptasznik,* 464 F. 3d at 695 (7th Cir.) (supervisor's comments made five times in the six months prior to plaintiff's termination that plaintiff was "too Polish" and "too old"…"although off-color and probably inappropriate for the workplace, nonetheless do not constitute sufficient evidence that her employer was motivated to terminate her because of her national origin or age."); *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1063 (7th Cir.2003) (statements regarding plaintiff's age did not form a convincing mosaic of circumstantial evidence sufficient to prevail under direct method where the prejudicial views were not clearly linked to termination decision).

This essentially leaves Plaintiff's PIP, the fact that she was not presented with a written response to her PIP, her complaint that she was targeted for staffing reductions, her complaint that Tonya Warner was reassigned to Papaioannou, and her allegations that Charles French and Anne Coyle "harassed" her by overly scrutinizing Plaintiff's team's and her performance. None of these allegations constitutes adverse employment actions. It is a truism that "not everything that makes an employee

14

unhappy is an adverse employment action." *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996). The Seventh Circuit has articulated three categories of actionable, materially adverse employment actions:

> (1) cases in which the employee's compensation, fringe benefits, or other financial terms of employment are diminished, including termination; (2) cases in which a nominally lateral transfer with no change in financial terms significantly reduces the employee's career prospects by preventing her from using her skills and experience, so that the skills are likely to atrophy and her career is likely to be stunted; and (3) cases in which the employee is not moved to a different job or the skill requirements of her present job altered, but the conditions in which she works are changed in a way that subjects her to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in her workplace environment.

*Nichols*, 510 F.3d at 780 (quotation omitted).

Plaintiff's PIP had no effect on her compensation, job duties, title, or her workplace environment and therefore is not an adverse employment action. (SOF ¶ 44). The same can be said about the decision not to provide a point-by-point response to Plaintiff's PIP. Plaintiff claims she was targeted for staffing reductions, yet she admits that her counterparts in Irving and Atlanta lost staff as well. (SOF ¶ 48-49). There is also absolutely no evidence to contradict LeClaire's testimony that all three offices experienced staffing reductions in proportion to their workload and head count, and that the Irving office actually suffered the biggest cut. *Id.* Plaintiff also complains about Tonya Warner's reassignment, yet she admits that Warner was not only unhelpful to Plaintiff, but that she actually created more work for Plaintiff. (SOF ¶ 55-58). It is hard to understand how removing her from Plaintiff's supervision was an adverse employment action when Plaintiff was dissatisfied with her work product and was complaining about having to spend time doing her work for her. *Id.* Plaintiff also complains about how French and Coyle treated her, calling it "harassment." However, neither French nor Coyle were Plaintiff's supervisors or direct reports. The fact that she perceived them to nit-pick her is exactly the type of thing that may have made her unhappy, but cannot rise to the level of an adverse

15

employment action. None of these remaining supposedly adverse actions fit any of the categories above, other than Plaintiff's termination. They had no impact on Plaintiff's compensation or career prospects, and none of them created a significantly negative alteration in her workplace. This leaves only Plaintiff's termination, which, standing alone, cannot possibly constitute circumstantial evidence of discrimination.

There is also no circumstantial evidence of retaliation, only Plaintiff's assumptions, generalizations, and argument. As an initial matter, as stated in the beginning of Section II above, the decision-maker's knowledge of the allegedly protected activity controls. Here, there is no evidence that any of the decision-makers believed that Plaintiff's 2008 complaints about her compensation were based on race or national origin until she filed her 2009 complaint with Simpson. (SOF ¶ 20). Therefore, none of the complained-of actions prior to April[9] 2009 could possibly be retaliatory, leaving only Defendants' decision not to provide a point-by-point reply to Plaintiff's PIP response, CR's investigation of Plaintiff's complaints, and Plaintiff's termination.[10]

As stated above, in order to be adverse, these actions must dissuade an average employee from filing a complaint. Plaintiff's PIP response was so detailed that it is simply unreasonable to expect any employment to provide a point-by-point reply to such a document, and as a result, no reasonable employee would be dissuaded by the fact that Defendants failed to do so. Plaintiff's complaints about CR's investigation into her allegations also do not constitute adverse employment actions. Plaintiff has not offered any evidence that the investigation was flawed. To say that the fact that an employee would

---

[9] Defendants argue that the first time Plaintiff complained of protected activity under § 1981, Title VII or the IHRA (i.e. discrimination based on race or national origin) was in her April 3, 2009 complaint to CR. Plaintiff will argue that her PIP response also contains these allegations. However, the PIP does not mention discrimination anywhere in the document and makes only one vague reference to retaliation. (SOF ¶ 45).

[10] Plaintiff complained to LeClaire that Coyle had made the alleged comments about Keith Lanier's sexuality sometime in 2008, and she made an extremely vague reference to inappropriate remarks by Coyle during her heated exchange with Coyle and French in January 2009. However, neither of these incidents implicated her in any way, she made them in the context of difficult conversations about her own performance, and they were either extremely untimely (in the case of the comment to LeClaire) or extremely vague (in the case of the comment to French).

16

be dissuaded from filing an internal complaint simply because CR found in the past that an employee's internal complaints would mean that any employer who found no merit in an employee's internal complaint could be held liable for retaliation. This simply defies logic.

Finally, there is no evidence that any of these actions, including her termination, had any causal connection to Plaintiff's complaints. There was no requirement that Defendants provide a point-by-point reply to her PIP response, and no evidence that they had ever done so in the past. (SOF ¶ 47). Plaintiff's complaints were investigated by CR personnel, including Stephanie Simpson who was in Memphis and completely divorced from the events in Chicago. (SOF ¶10). There is no evidence that either Street or Simmons were influenced in any way by LeClaire or Papaioannou in their investigation. They interviewed witnesses with whom Plaintiff takes no issue (e.g. Rick Hernandez), and concluded that Plaintiff's complaints were unsubstantiated. (SOF ¶69-71). Finally, Plaintiff's termination decision was motivated by her longstanding leadership and communication challenges. (SOF ¶ 82-98). LeClaire and Papaioannou noticed and addressed these issues before they became aware that Plaintiff had engaged in any protected activity. (SOF ¶20, 24-26, 28-47). Her termination was a result of LeClaire and Papaioannou independently coming to the conclusion that these issues would not be resolved. (SOF ¶ 93, 94, 98). The decision was reviewed by Johnson and Browne, both of whom work in Memphis and have almost no day-to-day interaction with the Chicago office, at least at Plaintiff's level. Based on all of the above, there is no direct or circumstantial evidence of discrimination based on race or national origin, or retaliation. Plaintiff must therefore proceed under the indirect burden-shifting method.

     **D.**     **Plaintiff Cannot Establish an Indirect Method *Prima Facie* Case of Discrimination Based on Race or Gender, or Retaliation.**

          1.     <u>Most of Plaintiff's Discrimination and Retaliation Claims Fail because They Are Not Actionable Adverse Actions Even if They Occurred.</u>

As stated in Section II.C. above, Defendants do not contest that Plaintiff's termination was an adverse employment action, but most of her other claims are not.[11]

### 2.  Plaintiff's Protected Activity.

Defendants do not deny that Plaintiff engaged in protected activity as of April 2009, when she complained to Stephanie Simpson about alleged discrimination, harassment and retaliation. However, as stated in Section II.C. above, nothing prior to that time can be possibly be considered retaliatory because none of the alleged discriminators were aware that Plaintiff's 2008 complaints were based on a protected category such as race or national origin.

### 3.  Plaintiff Did Not Meet Defendants' Legitimate and Reasonable Employment Expectations.

Although Plaintiff was performing the technical aspects of her job adequately, there can be no doubt that she was not meeting legitimate performance expectations with respect to communication and leadership. No less than *nine* individuals (Anne Coyle, Charles French, Angela Papaioannou, Tammy LeClaire, Rick Hernandez, Delaine Simmons, Tobin Beckerman and John Dooley and Tonya Warner), which included Plaintiff's supervisors, peers and subordinates, one of whom is Hispanic and Italian, one of whom is Greek and two of whom are African-American, all complained about Plaintiff's combative and defensive communication style, particularly via email. (SOF ¶ 25, 28-39, 37, 59-60, 84-86, 89-90). LeClaire testified in detail, and provided specific examples, of how she attempted to help Plaintiff improve in these areas. Instead of considering LeClaire's and Papaioannou's constructive feedback, Plaintiff became defensive and combative and brought up other employees' performance and disciplinary issues. (SOF ¶ 28-32). Plaintiff would like this Court to believe that Defendants found her

---

[11] Plaintiff's allegations regarding her 2005, 2007 and 2008 compensation could conceivably be adverse employment actions insofar as they allegedly reduced her compensation. However, as described above, there is absolutely no evidence that Plaintiff was denied any compensation to which she was entitled. There is simply nothing adverse about the complained-of pay decisions.

complaints about various aspects of her employment – protected activity – to be the "distraction" that so many witnesses testified she was causing in the office. In reality, as demonstrated by the number and diversity of individuals with whom Plaintiff simply could not get along, *she* was the distraction, and by virtue of that distraction she was not performing her job duties, as evidenced by her PIP. (SOF ¶ 25, 28-39, 37, 42, 59-60, 84-86, 89-90).

4.    <u>Plaintiff Cannot Show that a Single Similarly-Situated Employee Was Treated More Favorably.</u>

To prevail, Plaintiff "must show [s]he is similarly-situated" to specific employees "with respect to performance, qualifications and conduct" who were treated more favorably. *Frederick v. Henderson*, 232 F. Supp. 2d 901, 908 (N.D. Ill. 2002) (quoting *Snipes v. Illinois Dep't of Corrections*, 291 F.3d 460, 463 (7th Cir. 2002)). A similarly-situated individual must be "directly comparable in all material respects." *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 979 (7th Cir. 2004). Individuals with better performance and fewer complaints filed against them simply cannot be considered similarly situated. *Brown v. Ill. Dep't of Natural Res.*, 499 F.3d 675, 682 (7th Cir. 2007). At minimum, Plaintiff must prove that "the other employee dealt with the same supervisor, was subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish his conduct or the employer's treatment of him." *Caskey v. Colgate-Palmolive Co.*, 535 F.3d 585, 592 (7th Cir. 2008) (quotation omitted). Plaintiff testified that she believed Defendants discriminate against *all* non-White and non-Americans, not just Indians. (SOF ¶ 3). Therefore, Tonya Warner, for example, was actually in Plaintiff's protected class with respect to her race claim, but not her national origin claim, because she African-American. Similarly, Papaioannou is actually within Plaintiff's protected class with respect to the national origin claims as she self-identifies as Greek.

The only even arguably[12] similarly-situated individuals to whom Plaintiff compares herself are Charles French, Anne Coyle and Paul Betz and Gary Enneking. Thus, Plaintiff's claims of discrimination and retaliation necessarily fail under the indirect method of proof.

Charles French and Anne Coyle are not similarly situated to Plaintiff because they perform entirely different functions and supervise entirely different teams. (SOF ¶ 9). They also have different supervisors – French reports directly to LeClaire and Coyle to French, whereas Plaintiff reported to Papaioannou. *Id.* Significantly, unlike Plaintiff, French did not have interpersonal issues with anyone else at Sedgwick. Coyle had a history of write ups, but each were years apart. (SOF ¶ 81). Her write-ups had to do with completely different performance concerns than Plaintiff's. *Id.* Coyle got along with co-workers and clients alike, and was generally well liked, in significant contrast to Plaintiff. *Id.*

Plaintiff claims Betz was similarly situated because he held the same position as Plaintiff at the time of Plaintiff's termination. However, he had significantly more operations and project management experience than Plaintiff. He also worked well with both clients and colleagues. (SOF ¶ 75). Plaintiff complains that Betz was promoted to the Operations Manager position on the General Dynamics account in 2005, but as stated above, he was far more qualified than Plaintiff for the position. (SOF ¶ 74). She complains that he was not disciplined when 3M allegedly asked to have him removed from the account. (SOF ¶ 75). Plaintiff has absolutely no basis for this allegation, as she admits that CR told her it was untrue, and LeClaire testified that she transferred Betz on her accord. (SOF ¶ 75; Complaint ¶28(a)). Although Betz had difficulty fitting with one individual at 3M, unlike Plaintiff, this was an

---

[12] In her Answers to Interrogatories and during her deposition, Plaintiff identified Kim Lukanic, Cindy Craig, George Fisher, Christella Dudesek, Mary Kabala, and Megan James as potentially similarly situated individuals outside her protected class who were treated more favorably. (Plaintiff's Answers to Defendants' Interrogatories, Exhibit 5 to Plaintiff's Deposition, filed as Exhibit O to Defendants' Statement of Undisputed Material Facts). However, by her own admission, these individuals either worked on different accounts than Plaintiff and therefore operated in different reporting chain, were at an entirely different position within the AT&T account, or had no or completely different performance issues. Plaintiff has also failed to establish how many of them were treated more favorably, other than to make conclusory allegations that are without foundation and therefore inadmissible. These individuals cannot possibly be considered similarly situated.

isolated incident for Betz. (SOF ¶ 75). Plaintiff also complains that Betz received extra compensation and benefits when he transferred to Atlanta. (SOF ¶ 76). However, those perks were necessary to induce him to move, and unlike Betz Plaintiff would never have traveled for her job. *Id.*

Finally, Gary Enneking may have been similarly situated, but he certainly was not treated more favorably. Enneking was terminated for many of the same reasons as Plaintiff. (SOF ¶ 105). Plaintiff will argue that Enneking was treated more favorably because he was not terminated immediately when the flaws in his leadership abilities became apparent, but rather he was not terminated until he committed the egregious error of settling a case outside his authority. However, both Enneking and Plaintiff spent approximately the same amount of time in the Operations Manager position. *Id.* Therefore, it stands to reason the Enneking was given as much of an opportunity to correct his errors as was Plaintiff. Furthermore, Enneking would have been terminated even if he had not settled the case outside his authority. *Id.*

In short, there are no similarly situated individuals outside Plaintiff's protected class who were treated more favorably. As a result, she also fails to establish this third prong of the prima facie case.

5.     <u>Plaintiff Cannot Show that Defendants'' Rationale for Its Actions Was a Pretext for Discrimination or Retaliation.</u>

As the Court is well aware, in order to establish pretext, Plaintiff must show that Defendants' reasons for taking the complained-of actions are deliberately false, because "pretext means a dishonest explanation, a lie rather than an oddity or an error. "A pre-text . . . is a deliberate falsehood." *Kulumani*, 224 F.3d at 685 (7th Cir. 2000); *Forrester*, 453 F.3d at 419. In addition, even if reasonable people may disagree about the Defendants' decisions regarding Plaintiff,

> it is not [the court's] role to determine the competency of or interfere in employment decisions simply where [it] believe[s] an employer has made a poor choice. Federal courts have authority to correct an adverse employment action only where the employer's decision is unlawful, and not merely when the adverse action is unwise or even unfair. 'We do not sit as a super-personnel

21

department with authority to review an employer's business decision as to whether someone should be fired or disciplined because of a work-rule violation.' [Citation omitted.] Therefore, [the court's] inquiry is limited to whether there is a material factual dispute as to whether the employer honestly believed the stated, legitimate reasons for the adverse action.

*Ptasznik*, 464 F.3d 696.

There is no evidence of pretext in this matter. The undisputed evidence demonstrates that the Defendants' decisions were based on legitimate reasons, and that there is no evidence showing any of these decisions was based on Plaintiff's race, national origin or her internal complaints. In fact, the evidence shows quite the opposite. Defendants bent over backwards to work with Plaintiff, mentor her and help her improve her performance. (SOF ¶ 28-30). In fact, LeClaire promoted Plaintiff over Simmons' concerns about her abilities just a year and a half before her termination. (SOF ¶ 15). Papaioannou testified that her relationship with Plaintiff had improved prior to her 2009 trip to Greece, and that Plaintiff had attempted to handle the situation with Warner in July 2009 according to Papaioannou's recommendations. (SOF ¶ 82). She would not have done so if she were building a case against Plaintiff. However, the mounting evidence was that Plaintiff's communication and leadership difficulties would continue. Even Plaintiff's self-described mentor, a person of "integrity" became so fed up with Plaintiff that she filed a formal complaint against her. (SOF ¶ 25).

In fact, Plaintiff's issues continued even after her termination. Plaintiff was terminated from Northwestern Memorial Hospital ("NMH") and Career Education Corporation ("CEC") for engaging in nearly identical conduct (failure to accept constructive criticism, preoccupation with others' performance, email wars, etc.). (SOF ¶ 106). The strikingly similar performance deficiencies that Plaintiff exhibited at each employer is powerful evidence against pretext. If three different companies terminated Plaintiff for nearly exactly the same reasons, it stands to reason that Sedgwick, LeClaire and Papaioannou were not simply making it up. They were responding to Plaintiff's behavior. As even more evidence of Plaintiff's inability to reflect on and accept her own shortcomings, instead of seeing

this pattern in her own behavior, Plaintiff chose to blame NMH and CEC, like she did Sedgwick, and accuse the companies of unlawful violations of EEOC laws. *Id.*

Defendants' urge this Court to see the situation described in the allegations and defenses in this lawsuit not for what Plaintiff has twisted it into, but for what it really is – well-intentioned supervisors struggling to deal with an extremely difficult employee.

### E.    Plaintiff's Defamation Claims Fail as a Matter of Law.

Plaintiff's final claim should be dismissed in short order as it is entirely without foundation and is completely unsupported by admissible evidence. Plaintiff has not identified a single statement made by a particular individual which she purports to be defamatory. Rather, her allegations in support of this count are pure conjecture. She concludes that someone at Sedgwick must have given prospective employers negative references because she happened to not receive invitations for second round interviews. (SOF ¶ 109-110).[13] The closest Plaintiff comes to evidence of defamation is a LinkedIn message from Kristi Pease, who is apparently a former employee of Matrix Absence Management, and who informs Plaintiff that she used to have an email from the president of Matrix which "alluded to someone in HR" at Sedgwick saying something that Pease concluded would be actionable defamation. This email is quite obviously double, if not triple, hearsay, and it lacks foundation. As the Seventh Circuit has already described in a similar case, "the only evidence [Plaintiff] offers is her own testimony that another [former] employee told her about information received from the employee's superiors…. This is inadmissible hearsay on multiple levels and is 'not enough to preclude summary judgment.'" *Haywood v. Lucent Technologies, Inc.*, 323 F. 3d 524, 533 (7th Cir. (2003) (citation omitted). Furthermore, "vague, unprovable statements and statements of opinion do not give rise to a

---

[13] Plaintiff neglects the fact that prospective employers may have googled her name and decided not to pursue her any further based on the result. Googling "Ratna Bagwe" not only turns up the present lawsuit, but also turns up a blog dedicated to complaining about the way Plaintiff handled a particular individual's disability claim while she was at Sedgwick. It prominently features a picture of the wicked witch of the west and is titled "Ratna's Rants." *See,* http://www.gesupplydiscrimination.com/files/html/Ratna%20Bagwe.htm

defamation claim; instead, Illinois law requires that the allegedly defamatory statement contain an objectively verifiable factual assertion." *Wynne v. Loyola Univ. of Chicago,* 318 Ill.App.3d 443, 251 (3rd Dist. 2000). *See also, Experian Info. Solutions, Inc. V. Carfax, Inc.,* No. 11 CV 08927, 2012 U.S. Dist. LEXIS 92656, at *14 (N.D. Ill. July 5, 2012) (noting that "shapeless" allegations are expressions of opinion and lack the specificity and factual content necessary to be verifiable and deemed factual assertions). There is simply no basis for Plaintiff's defamation claims.

**F.      To the extent she even brings one, Plaintiff's harassment claim must fail.**

Although Plaintiff peppers the word "harassment" in her deposition and Complaint, none of the ten detailed counts articulated in Plaintiff's Complaint include harassment or even use the words "harassment" or "hostile work environment." (Complaint ¶¶55 - 119). Her answer to Defendants' Interrogatory No. 15 also specifically asks her to describe the facts that she claims constitute harassment, and instead of providing an answer, she punted by stating "I am not an attorney, and I cannot distinguish between incidents of discrimination, harassment and retaliation." Exhibit O, Plaintiff's Dep., Ex. 5,  p. 17. She then lists dozens of complaints, saying "I believe that all of these actions were taken against me because of my race or national origin, to harass me, and/or in retaliation for complaining about discrimination…" *Id.* To the extent these vague and evasive responses constitute a properly plead harassment claim, which Defendants deny, the claim cannot possibly survive summary judgment as a matter of law. It is Plaintiff's burden to prove a prima facie case of actionable harassment by demonstrating, among other things, that the harassment was based on her race and/or national origin, and the harassment was so severe or pervasive so as to alter the conditions of her work environment by creating a hostile or abusive situation. *Williams v. Waste Mgmt. of Ill., Inc.*, 361 F.3d 1021, 1029 (7th Cir. 2004). Regardless of its nature, "the conduct must be extreme to amount to a change in the terms and conditions of employment." *Faragher*, 524 U.S.775, 788 (1998); *see also McPherson v. City of Waukegan*, 379 F.3d 430, 438 (7th Cir. 2004) (the actionable workplace is

not "merely unpleasant;" it is "hostile or deeply repugnant") (citation omitted). Simply put, even in the aggregate, none of Plaintiff's allegations meet this standard. Furthermore, Sedgwick cannot be held liable for alleged harassment because it was not negligent in discovering or remedying any of the alleged harassment. *Durkin v. City of Chicago*, 199 F. Supp. 2d 836, 848 (N.D. Ill. 2002). *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1014-1015 (7th Cir. 1997). It also "(a) exercised reasonable care to prevent and correct promptly any harassing behavior, and (b) [the] employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998). Furthermore, Sedgwick maintains robust anti-harassment policies, offers multiple reporting avenues to employees who suspect harassment, and it promptly investigates all harassment allegations and takes prompt remedial measures to correct any issues. (SOF ¶ 2).

## III.   CONCLUSION

Plaintiff will no doubt argue that the case's complexity (many facts, a voluminous record, and multiple claims) entitles her to a jury trial on the theory that "there must be an issue of material fact in there somewhere." But, at bottom, this case is very simple. It is nothing more than a large collection of Plaintiff's opinions and conjecture that she is the victim of a vast conspiracy of discrimination and retaliation. However, once the layers of her claims are peeled back by carefully reviewing the evidence, it becomes clear that there are no material issues of fact and Plaintiff's claims are without support.

Summary judgment "is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005). Plaintiff has "put up" nothing more than self-serving opinions, speculation, and conclusions, upon which no reasonable jury could rule in her favor. Thus, the Court should grant summary judgment to Defendants' on all of Plaintiff's claims.