## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| RATNA BAGWE, | ) | |
| | ) | No. 11 CV 2450 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Magistrate Judge Young B. Kim |
| | ) | |
| SEDGWICK CLAIMS MANAGEMENT | ) | |
| SERVICES, INC., TAMMY LECLAIRE, | ) | |
| and ANGELA PAPAIOANNOU, | ) | |
| | ) | September 5, 2014 |
| Defendants. | ) | |

### MEMORANDUM OPINION and ORDER

Ratna Bagwe, who was born in India, worked as an operations manager for Sedgwick Claims Management Services, Inc., under the supervision of Tammy LeClaire and Angela Papaioannou (collectively, "the defendants"), until she was fired in August 2009. The defendants say that they fired Bagwe because she had poor leadership and communication skills, marked by her tendency to engage in distracting and unnecessarily confrontational "email wars" with colleagues. Bagwe claims they fired her because of her national origin and race and to retaliate against her for complaining about discrimination. In April 2011 she filed this discrimination and retaliation lawsuit under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, the Civil Rights Act of 1866, 42 U.S.C. § 1981, and the Illinois Human Rights Act ("IHRA"), 775 ILCS 5/1-102, *et seq.*[1] The parties

---

[1] Bagwe's complaint also includes a defamation claim, but in her response to the current motion she asserts that she "withdraws the prosecution of her defamation

have consented to this court's jurisdiction.  *See* 28 U.S.C. § 636(c); (R. 33).

Currently before the court is the defendants' motion for summary judgment.

(R. 142.)  For the following reasons, the motion is granted:[1]

## Background

As an initial matter, it must be noted that although the majority of the facts set forth in the parties' Local Rule 56.1 statements are either undisputed or immaterial to the case's outcome, there are repeated instances in which one side states that a fact is disputed, but to demonstrate the dispute, the party either cites record evidence that does not contradict the relevant fact or relies on supposed inferences that could be made to contradict a fact rather than actual conflicting evidence.  As an example, Bagwe repeatedly states that a fact is undisputed, but then writes "Plaintiff disputes any inference" that the fact means a particular thing.  (See, e.g., R. 162, Pl.'s Resp. to Defs.' Facts ¶¶ 4, 16, 17, 23, 36.)  At this phase, Bagwe will enjoy the benefit of every reasonable inference that can be drawn in her favor.  *See O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).  But arguing over the possible inferences stemming from an otherwise undisputed fact does not render that fact in dispute.  Where a party has attempted to dispute a material fact without pointing to appropriate supporting evidence or otherwise has tried to manufacture a dispute where none exists, the fact is deemed admitted.  L.R. 56.1(b)(3); *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003).  The following undisputed facts are taken from the parties' Local Rule 56.1 statements of facts

---

claims."  (R. 157, Resp. at 6 n.3.)  This court treats that statement as a request to voluntarily dismiss the defamation claim.

(unless otherwise indicated), and will be viewed, as they must be at this stage, in the light most favorable to Bagwe. *See O'Leary*, 657 F.3d at 630.

Bagwe was born in India and is of Indian descent. (R. 162, Pl.'s Resp. to Defs.' Facts ¶ 3.) Sedgwick is a company that provides claims management services to employers for liabilities including workers' compensation and disability claims. (Id. ¶ 1.) Sedgwick hired Bagwe into its Chicago office in March 2001 to help service its account with AT&T. (Id. ¶ 3.) From 2001 until late 2007, Bagwe reported to Operations Manager DeLaine Simmons. (Id. ¶¶ 7, 11-12.) In 2005 Bagwe was promoted to the position of Assistant Manager II, receiving a merit increase in her compensation but not a promotional increase. (Id. ¶ 12.) In 2006 she received a Visionary Performer Award—the highest level award for Sedgwick's company-wide employee recognition program. (R. 166, Defs.' Resp. to Pl.'s Facts ¶ 2.)

From February until September 2007, Simmons was assigned to a project in California, and Bagwe assisted with some of Simmons's duties in the interim. (R. 162, Pl.'s Resp. to Defs.' Facts ¶ 13.) At the time she did not receive a pay increase for performing these interim functions. When Sedgwick revised its reporting structure for the AT&T account in late 2007 Bagwe was promoted. (Id. ¶¶ 8, 15.) At that time Simmons stepped into a newly created role as Area Manager for clients other than AT&T, and Papaioannou became the Area Manager for AT&T. (Id. ¶ 8.) Bagwe, in turn, stepped into Simmons's previous position as Operations Manager III in Chicago, earning her a promotional raise, which was followed by

another raise seven months later.  (Id. ¶¶ 8, 15.)  In this new role, Bagwe reported to Papaioannou, who reported to LeClaire.  (Id. ¶¶ 4-5, 15.)

## A.    Bagwe's Complaint About Her Compensation

Throughout Bagwe's tenure with Sedgwick, decisions about her compensation were made by her direct supervisors with approval from management and Sedgwick's human resources office, known within the company as Colleague Resources.  (Id. ¶ 16.)  Although budgeting issues meant that yearly compensation increases varied, a 3% increase was considered a standard pay raise and a 5% increase was considered a pay raise reserved for outstanding performance.  (Id. ¶ 17.)    During  an  early  April  2008  conference  call,  Bagwe  complained  to Papaioannou  and  Colleague  Resources  Manager  Carla  Street  about  her compensation.  (Id. ¶ 10; R. 166, Defs.' Resp. to Pl.'s Facts ¶ 18.)  Specifically, she complained that back in 2005 she did not receive a promotional increase and asserted that she should have received a pay increase in 2007 when she functioned as the Interim Operations Manager during Simmons's absence.  (R. 162, Pl.'s Resp. to Defs.' Facts ¶ 19.)

On April 9, 2008, Papaioannou emailed LeClaire a summary of Bagwe's compensation concerns, including Bagwe's belief that her pay and others' pay was not "equitable."  (R. 166, Defs.' Resp. to Pl.'s Facts ¶ 19.)  Two days later Bagwe followed up on the conversation by sending a memo to Street that she had prepared for Papaioannou's attention describing her concerns about her compensation and other employees' pay.  (Id. ¶ 21.)  Bagwe's memo does not reference her race or

national origin nor does it assert that any pay disparity was the product of discrimination. (R. 163, Pls.' Facts, Ex. 24.) Much of the memo addresses Sedgwick's application of the 3% merit increase guidelines and questions the breakdown of merit increases awarded to other employees. (Id.) Nowhere in that discussion does she mention the race, national origin, or any other protected category as it applies to those employees. (Id.) Nor does she identify what specific salary or increase she was seeking. Bagwe's compensation complaints were based partly on her assertion that Simmons had not fulfilled her promise of a promotional increase in 2005. (R. 162, Pl.'s Resp. to Defs.' Facts ¶¶ 19, 22.)

Bagwe's assertion regarding Simmons's unfilled promise was the subject of several emails between the two, beginning with Simmons's email denying having promised any such deal. She wrote to Bagwe that "it is not always what we say but how we say it" and that "the manner in which you have chosen to pursue these issues is unprofessional and a disservice to our colleagues." (R. 163, Pl.'s Facts, Ex. 25.) Simmons asked Bagwe to forward further concerns or issues about her to Colleague Resources. (Id.) Bagwe then responded to Simmons stating that "I will respond to you with a lot more documents and to all your statements." (Id.) Simmons responded by telling Bagwe she was "done with this" and that whatever further discussion Bagwe wanted to engage in should be sent to her supervisors or Colleague Resources. (Id.) Bagwe responded to her again, saying "I can't believe a simple request has turned into this bitterness and attack on me." (Id.)

At that point, Simmons sent Regional Colleague Resources Director Stephanie Simpson an email making a formal complaint against Bagwe, saying she felt that Bagwe had attacked her personal integrity.  (Id.; R. 162, Pl.'s Resp. to Defs.' Facts ¶ 26.)  According to Simmons, Bagwe's complaint was offensive because Simmons had never promised her any "side deal," had compensated her within the required budget constraints, and because she expected any compensation complaints to be raised in a timely manner.  (R. 162, Pl.'s Resp. to Defs.' Facts ¶ 25.)  After Simmons sent the email, LeClaire encouraged her to withdraw the complaint, and Simmons did so the same day.  (Id. ¶ 26.)

## B.   Bagwe's Heated Conversation with Colleagues

Eleven months after she raised her compensation concerns, on January 7, 2009, Bagwe and a colleague named Ann Coyle got into a heated conversation near Bagwe's office.  (Id. ¶ 59.)  According to Bagwe, Coyle began grilling her about problems with reports and diary submissions.  (Id.)  At some point AT&T Account Executive Charles French heard the raised voices and joined the conversation.  (Id. ¶¶ 9, 60.)  Coyle told French that Bagwe had accused her of making an inappropriate comment about another colleague.  (Id.)  French asked Bagwe to describe the remarks and to identify the person who ascribed them to Coyle, but Bagwe did not do so.  (Id.)  Following the conversation, French reported to Street that Bagwe had accused Coyle of making inappropriate comments and voiced the opinion that Coyle's behavior was inappropriate.  (Id. ¶ 62.)  French told Street that he was concerned that Bagwe had made vague accusations and that he was upset

that she had not reported the accusations against Coyle to Colleague Resources when she first heard them.  (Id.)

The day after the confrontation, Bagwe emailed Papaioannou and copied French requesting a meeting to discuss Coyle's behavior.  (R. 166, Defs.' Resp. to Pl.'s Facts ¶ 31.)  On February 10, 2009, Bagwe, French, and possibly Street met to discuss Bagwe's allegations about Coyle.   (R. 162, Pl.'s Resp. to Defs.' Facts ¶ 63.) During the meeting, Bagwe said that on June 17, 2008, she, LeClaire, and Coyle were at a bar during a business trip to Atlanta, when they began discussing LeClaire's divorce.  (Id. ¶ 64.)   According to Bagwe, during that conversation LeClaire made a comment advising Bagwe to get rid of her "old Indian husband," and Coyle offered to help her find a white man.  (Id.)  Bagwe also disclosed that during a work-related evening with a client at a bar in Texas, Coyle had made fun of a co-worker's homosexuality with a "clapping-type hand gesture."  (Id. ¶ 65.) Bagwe did not report the incidents to anyone at the time.  (Id.)

## C.    The Performance Improvement Plan

From mid-2008 through Bagwe's termination, LeClaire observed that Bagwe tended to deflect criticism by making allegations about other employees.  (Id. ¶¶ 30-31.)  LeClaire and Papaioannou also testified that they were aware that Bagwe engaged in what they described as "email wars" with other employees.  (Id. ¶ 33.) They testified that experiences with Bagwe sending "confrontational and escalating" emails caused some employees to avoid basic correspondence with her. (Id.)  For example, in April 2008 one of Bagwe's team members, Tanya Warner,

complained to Papaioannou that Bagwe was not providing her with the information she needed to do her job and that Bagwe's communications with her were unnecessarily confrontational in style. (Id. ¶ 56.) Papaioannou reassigned Warner so that she no longer reported directly to Bagwe. (Id.)

In late 2008 or early 2009, French began noticing what he considered to be problems with Bagwe's team's performance, error rate, supervision, and diary completion. (Id. ¶ 35.) He raised the issues with Bagwe and Papaioannou at that time. (Id.) In January 2009 French sent Papaioannou an email expressing his opinion that Bagwe's team was suffering from poor leadership and negativity. (Id. ¶ 36.) He forwarded the email to Coyle, commenting that the "[g]loves are off." (Id. ¶ 38; R., 163, Pl.'s Facts, Ex. 53.) In February 2009 French prepared a memorandum addressed to LeClaire, with copies to Street and Papaioannou, outlining his issues relating to Bagwe's performance, including specific examples of what he perceived as deficiencies in her operations, communications, and judgment. (R. 162, Pl.'s Resp. to Defs.' Facts ¶ 38.) He wrote that he had called a meeting with Bagwe and her team regarding performance issues, but felt that the team "failed to take ownership of the current issues and they failed to provide one action plan to address the deficiencies." (R. 145, Defs.' Facts, Ex. I, French Dep., Ex. 80 at 1.) He also wrote about the meeting in which Bagwe accused Coyle of making discriminatory comments about another colleague but failed to provide any specifics when French asked for them. (Id. at 2.) He wrote that he told Bagwe to address

such issues "immediately and not wait months or a year to bring them up." (Id.) He summarized his position by writing that:

> Overall I believe that [Bagwe] demonstrates poor leadership skills in trying to support the leadership on the program and for not taking appropriate actions to address issues that are brought to her attention. She is very re-active and defensive on her positions and rarely makes any suggestions or attempts to be pro-active in her role as the Operations Manager in Chicago. She has a tendency to divide the teams rather than unite them toward a common goal.

(Id. at 3.)

LeClaire, Papaioannou, and Street met to discuss Bagwe's performance and decided to prepare a written Performance Improvement Plan ("PIP"). (R. 162, Pl.'s Resp. to Defs.' Facts ¶ 40.) The PIP referenced French's concerns and Papaioannou's disappointment with how Bagwe handled the team meeting referenced in his memo. (R. 145, Defs.' Facts, Ex. O, Bagwe Dep., Ex. 17 at Sedgwick 1225.) The PIP also noted that Bagwe had complained via email that Coyle made disparaging remarks during a staff meeting, but that Papaioannou had to ask Bagwe several times to provide the names of those examiners before she complied. (Id. at Sedgwick 1226.) Papaioannou called Bagwe's participation in that email exchange "challenging, accusatory, inappropriate and insubordinate." (Id.) Papaioannou criticized Bagwe for failing to provide specifics after making accusations about Coyle's comments and for failing to address such issues when they arise as opposed to "a year later." (Id. at Sedgwick 1227.) The PIP required Bagwe to attend leadership training and to meet weekly with Papaioannou to discuss her progress in meeting the identified goals. (R. 162, Pl.'s Resp. to Defs.'

Facts ¶ 44.)  It also explicitly instructed that "[i]f any portion of the corrective action required does not occur immediately or during the specified timeframe given, immediate termination of employment may occur without further notice."  (R. 145, Defs.' Facts, Ex. O, Bagwe Dep., Ex. 17 at Sedgwick 1228.)

Papaioannou and LeClaire presented the PIP to Bagwe during a meeting on March 12, 2009.  (R. 162, Pl.'s Resp. to Defs.' Facts ¶ 41.)  At one point the meeting became confrontational, with both Bagwe and LeClaire raising their voices.  (Id.)  According to Bagwe, LeClaire pointed her finger at Bagwe and told her to "be careful." (Id.)

On April 1, 2009, Bagwe presented Papaioannou, Simpson, and Street with an 18-page, single-spaced written rebuttal to the PIP along with a binder full of documents.  (Id. ¶ 45.)   She used the word "retaliation" once in her rebuttal, in reference to a meeting French and Papaioannou convened after she asked to discuss Coyle's behavior.  (Id.; R. 145, Defs.' Facts, Ex. O, Bagwe Dep., Ex. 17, at Sedgwick 1231.)  Nowhere in the memorandum did Bagwe mention her race or national origin or say that she believed the PIP itself to be an act of retaliation.  (R. 162, Pl.'s Resp. to Defs.' Facts ¶ 45.)  LeClaire and Papaioannou reviewed the memorandum but concluded that Bagwe's rebuttal did not warrant the removal of the PIP.  (Id. ¶ 47.)

## D.    Bagwe's Discrimination Complaints

On April 3, 2009, two days after she presented her PIP rebuttal, Bagwe sent Simpson a written complaint regarding discrimination.  (Id. ¶ 50.)  She wrote that she had endured "discrimination, harassment, bullying, and a hostile work

environment" and felt she was "left with no choice" but to come forward after Papaioannou and LeClaire gave her the PIP. (R. 145, Defs.' Facts, Ex. O, Bagwe Dep., Ex. 17 at Sedgwick 1247.) Bagwe wrote that LeClaire "made a huge leadership issue" in retaliation against her 2008 complaints about her compensation. (R. 166, Defs.' Resp. to Pl.'s Facts ¶ 43.) She said that during the PIP meeting LeClaire "blatantly said 'You think you are good but you are no good.'" (Id.; R. 145, Defs.' Facts, Ex. O, Bagwe Dep., Ex. 17 at Sedgwick 1247.) She wrote that she felt "threatened" and that Papaioannou and LeClaire "are out to get" her. (R. 145, Defs.' Facts, Ex. O, Bagwe Dep., Ex. 17 at Sedgwick 1247.) Simpson opened a discrimination investigation and forwarded Bagwe's complaint to Senior Vice President of Colleague Resources Rachel Jackson and Executive Vice President and Chief People Officer Terri Browne. (R. 166, Defs.' Resp. to Pl.'s Facts ¶¶ 44-45; R. 162, Pl.'s Resp. to Defs.' Facts ¶¶ 10, 50.)

During the pending investigation, on May 1, 2009, Bagwe contacted Street to report that during a meeting in which employees were gathered to discuss company protocol for responding to the H1N1 virus, Coyle had made a comment to another employee, Rick Hernandez. (R. 162, Pl.'s Resp. to Defs.' Facts ¶ 66.) Bagwe said she did not hear the whole conversation, but she overheard Coyle say "that's why I don't live in Pilsen" and used the term "your people" in talking to Hernandez. (Id.)

According to Bagwe, in June or early July 2009 she was leaving a lunch with LeClaire and inquired about her sister-in-law. (Id. ¶ 72.) Bagwe says that LeClaire

responded, "which one, the Indian?" and then said that she did not like her sister-in-law.  (Id.)

On June 15, 2009, Simpson completed a report outlining her investigation of Bagwe's complaints.  (Id. ¶ 69.)  In her report she wrote that Bagwe's compensation was fair based on her time in her position.  (Id.)  As for Bagwe's complaints about Coyle, Simpson wrote that Coyle had not violated an EEO policy but recommended that French formally address her inappropriate interactions.  (Id.)  Simpson and Street met with Bagwe on June 17, 2009, to present the report.  (R. 166, Defs.' Resp. to Pl.'s Facts ¶ 51.)  They told Bagwe that she would receive a "spot bonus" in recognition for her 2007 Interim Operations Manager work.  (Id.)

Seven days after Simpson issued the report concluding the investigation Bagwe emailed Simpson reiterating her compensation complaints and referencing a spreadsheet comparing her compensation to others'.  (R. 162, Pl.'s Resp. to Defs.' Facts ¶ 70.)  According to Bagwe, she was the lowest paid Operations Manager on the AT&T account.  (Id.)  Bagwe asked in the email, "[i[f discrimination is not the reason, please help me understand why my repeated requests to have compensation addressed based solely on the merits of the situation have not been considered." (R. 166, Defs. Resp. to Pl.'s Facts. ¶ 53.)  Bagwe asked Simpson not to share the email with Papaioannou or LeClaire because of the "backlash" she experienced in 2008.  (Id.)  Simpson forwarded Bagwe's salary report to Jackson, who reviewed the report and advised Simpson to tell Bagwe that the investigation was closed.  (Id.

¶ 70.)  After Simpson received Jackson's advice, on July 28, 2009, she drafted a close out letter telling Bagwe that there was no evidence of pay inequity.  (Id. ¶ 71.)

## E.    Bagwe's Termination

On July 16, 2009, Simmons ran into Warner (the member of Bagwe's team who had been reassigned to report to Papaioannou) in their office lobby.  (Id. ¶ 84.) Warner was very upset and crying.   (Id.)   She told Simmons that Bagwe was harassing her over email.  (Id.)  Simmons called LeClaire that day (Papaioannou was away on vacation) to relay what Warner had said.  (Id. ¶¶ 84-85.)  LeClaire talked to Warner about the incident, who told her that confrontational emails with Bagwe were a constant problem.  (Id. ¶ 85.)  When Papaioannou returned from her trip, LeClaire told her about the conversation with Warner and discussed with her Bagwe's overall performance during the previous two years.   (Id. ¶ 87.) Papaioannou was aware that there had been recent accusations of inappropriate emails between Bagwe and colleagues because one of her subordinates had emailed Papaioannou during her vacation to report that such emails were "non-stop."  (Id. ¶ 89.)    LeClaire and Papaioannou agreed that LeClaire should recommend terminating Bagwe.  (Id. ¶ 94.)  LeClaire brought that recommendation to Browne, who approved the decision.  (Id. ¶ 97.)

Bagwe was terminated on August 13, 2009, during a meeting with Street and Jackson.   (Id. ¶ 100.)   Bagwe claims that before the meeting she stopped by Papaioannou's office to say hello and as she was walking away heard Papaioannou say "Indian Bitch."  (Id. ¶ 101.)   Although Sedgwick maintains a Termination

Questionnaire and Checklist to guide the termination process, none was completed with respect to Bagwe's termination. (R. 166, Defs.' Resp. to Pl.'s Facts ¶¶ 13, 16.)

Following a competitive posting process Bagwe's position was filled by a white American. (R. 162, Pl.'s Resp. to Defs.' Facts ¶ 104.) Bagwe's replacement suffered leadership problems and failed to adequately learn some of the technical aspects of his role. (Id.) Papaioannou counseled the replacement but when his performance did not improve, and after he settled a case outside his authority, Sedgwick fired him. (Id.)

Bagwe claims that after her termination Sedgwick interfered with her attempts to get jobs at several companies. (Id. ¶ 108.) Her most specific assertion is that someone at Sedgwick told the CEO of one of her potential employers that she is a "problem." (R. 166, Defs.' Resp. to Pl.'s Facts ¶ 104.) Despite these difficulties, Bagwe gained employment first at Career Education Corporation and then at Northwestern Memorial Hospital. (R. 162, Pl.'s Resp. to Defs.' Facts ¶ 105.) She was terminated for cause from both positions, for issues such as "failure to communicate, preoccupation with other employees' performance and disciplinary issues, failure to accept constructive criticism, defensive behavior, and engaging in improper email communication [and] 'email wars.'" (Id.)

## Analysis

Before getting to the heart of the parties' summary judgment positions the court must address the preliminary considerations the defendants raised in their opening brief with respect to the nature and timing of Bagwe's claims. The

defendants first argue that to the extent Bagwe is raising a separate pay discrimination claim, any such claim is untimely. The defendants point out that under Title VII and the IHRA a plaintiff is required to file a charge with the EEOC or state equivalent before filing a federal suit. *See Doe v. Oberweiss Dairy*, 456 F.3d 704, 708 (7th Cir. 2006). Under Title VII, the EEOC charge covers a window of 300 days before the date the charge is filed. 42 U.S.C. § 2000e-5(e)(1). IHRA claims must be filed with the EEOC or the Illinois Human Rights Department within 180 days of the discriminatory act. 775 ILCS 5/7A-102(A)(1), (A-1)(1); *Scott v. City of Kewanee*, No. 13 CV 1292-SLD, 2014 WL 1303025, at *4 (C.D. Ill. March 28, 2014). If a plaintiff does not file a charge regarding a discrete claim within that window, her claim is time-barred. *See Bass v. Joliet Public Sch. Dist. No. 86*, 746 F.3d 835, 839 (7th Cir. 2014).

The defendants point out that Bagwe filed her EEOC charge on December 12, 2009, and they argue that any claim based on pay disparity arising in 2005 or 2007 falls outside of the administrative window. Similarly, they argue that under the four-year statute of limitations applicable to claims arising under § 1981, *see* 28 U.S.C. § 1658, any claim Bagwe has for pay disparity arising under that statute is barred to the extent the alleged disparity predates April 12, 2007. In her response to the defendants' motion for summary judgment, Bagwe fails to acknowledge, let alone rebut, these arguments. Although she might have raised the argument that her disparate pay claim is saved from the time bar because it rests on a continuing violation, her response brief is silent on the issue, and so any such argument is

waived. *See Malin v. Hospira, Inc.*, No. 13-2433, __ F.3d __, 2014 WL 3896175, at *8 n.2 (7th Cir. Aug. 7, 2014) (declining to consider whether continuing violation would allow the plaintiff to reach beyond statute of limitations where she failed to raise argument); *LG Elecs. v. Whirlpool Corp.*, No. 08 CV 242, 2009 WL 5579006, at *3 (N.D. Ill. Nov. 23, 2009) (noting that a party waives arguments not presented to court in response to summary judgment motion). Accordingly, although the court will view any evidence regarding discriminatory pay disparity as potentially supporting evidence for her timely raised discrimination claim, *see Oest v. Ill. Dep't of Corrs.*, 240 F.3d 605, 614 n.4 (7th Cir. 2001), the court agrees that any separate and distinct pay discrimination claim that arose before April 12, 2007, is time-barred.

The defendants also argue that any discrimination claim Bagwe is making under § 1981 should be dismissed because, they say, the statute does not allow recovery for acts of discrimination based on national origin. Accordingly, the defendants argue that only her race discrimination claims are viable under this statute. Although it is true that national origin discrimination is not expressly prohibited under § 1981, the Supreme Court has interpreted the statute broadly, noting that it protects against intentional discrimination based on ethnicity or ancestry. *See Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987); *see also Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 695 n.4 (7th Cir. 2006). Given that broad reading together with the fact that Bagwe's § 1981 claims cover

discrimination and retaliation based on both race and national origin, the defendants are not entitled to dismissal of those claims.

## A.     Summary Judgment Standards

Summary judgment is appropriate if the moving party shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56.  Although reasonable inferences that can be drawn from the facts will be viewed in Bagwe's favor, she "is not entitled to the benefit of inferences that are supported by only speculation or conjecture." *See Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 599 (7th Cir. 2014) (internal quotation omitted).  At the same time, the court's role at this stage is not to "weigh the evidence or engage in fact-finding," but rather to "simply determine whether there is a genuine issue for trial." *Hasan v. Foley & Lardner LLP*, 552 F.3d 520, 527 (7th Cir. 2009).  A genuine issue of "material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Cung Hnin v. TOA (USA), LLC*, 751 F.3d 499, 504 (7th Cir. 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The parties agree that Bagwe's Title VII, IHRA, and § 1981 claims are all analyzed under the same evidentiary rubrics—the direct and indirect methods of proof.  (R. 143, Defs.' Mem. at 5, n.3; R. 160, Pl.'s Resp. at 8); *see Whitfield v. Int'l Truck & Engine Corp.*, 755 F.3d 438, 442 (7th Cir. 2014) (noting that "Title VII claims and 42 U.S.C. § 1981 claims incorporate the same liability standard"); *Hoosier v. Greenwood Hospitality Mgmt. LLC*, No. 11 CV 3816, __ F.Supp.2d __,

2014 WL 1245112, at *5 (N.D. Ill. March 26, 2014) (noting that courts generally apply same standards to IHRA, § 1981, and Title VII discrimination claims). But rather than using her response brief to demonstrate how the record supports her position specifically under either or both methods, Bagwe argues that the formal distinction between the direct and indirect methods has been "jettisoned" and simply lists a host of circumstantial evidence that she says can get her past summary judgment on her discrimination and retaliation claims under either method. (R. 160, Pl.'s Resp. at 5-6, 8-10.) Although a "growing chorus of opinions" in the Seventh Circuit "have expressed frustration with the confusing 'snarls and knots' of this ossified direct/indirect paradigm," *Hitchcock v. Angel Corps., Inc.*, 718 F.3d 733, 737 (7th Cir. 2013), the Seventh Circuit also has acknowledged that it is not "authorized to abjure a framework that the Supreme Court has established," *Green v. Am. Fed'n of Teachers/Ill. Fed'n of Teachers Local 604*, 740 F.3d 1104, 1106 (7th Cir. 2014). Thus, although both methods are designed to answer the same question—whether a jury could find unlawful discrimination or retaliation— courts continue to consider the direct and indirect methods separately in analyzing motions for summary judgment in employment discrimination cases. *See Orton-Bell v. Ind.*, No. 13-1235, __ F.3d __, 2014 WL 3566338, at *4 (7th Cir. July 21, 2014).

Bagwe explains her choice to forego presenting her evidence in light of the established frameworks by asserting that "the sheer number of pieces of evidence available" makes it difficult to organize, noting that she "nonetheless endeavors to describe below *some* of the evidence on which a jury could rely to find in Plaintiff's

favor." (R. 160, Pl.'s Resp. at 13 (emphasis added).) Organizational difficulties notwithstanding, this court may consider only the evidence she presents in response to the motion in determining whether there are triable issues of fact. As numerous cases make clear in frank terms, summary judgment is the "put up or shut up moment in litigation," meaning that "the non-moving party is required to marshal and present the court with the evidence she contends will prove her case." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010) (internal quotations omitted). Failure to do so results in summary judgment for the moving party. *See* Fed. R. Civ. P. 56(e); *AA Sales & Assoc., Inc. v. Coni-Seal, Inc.*, 550 F.3d 605, 612-13 (7th Cir. 2008). Accordingly, in analyzing the current motion the court has considered only that evidence that Bagwe actually has identified in her response as supporting her position.

## B.    Bagwe's Claims of Race and National Origin Discrimination

To succeed on her status-based discrimination claims, Bagwe must show that she is a member of a protected class, that she has been subjected to an adverse employment action, and that the defendants took the adverse action because of her membership in a protected class. *See Morgan v. SVT, LLC*, 724 F.3d 990, 995 (7th Cir. 2013). In other words, she must show "that the motive to discriminate was one of the employer's motives, even if the employer also had other, lawful motives that were causative in the employer's decision." *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S.Ct. 2517, 2523 (2013). She may do so under either the direct or

indirect methods of proof, and here, despite her argument that those paradigms are outmoded, she has elected to proceed under both.  (R. 160, Pl.'s Resp. at 11.)

1.    **Direct Method**

The direct method of proof requires Bagwe to show "either through direct or circumstantial evidence that the employer's decision to take the adverse job action was motivated by an impermissible purpose, such as her race or national origin." *See Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 938-39 (7th Cir. 2003).  Direct evidence requires "an admission of discriminatory intent," *Tank v. T-Mobile USA, Inc.*, No. 13-1912, __ F.3d __, 2014 WL 3360476, at *2 (7th Cir. July 10, 2014), so it is far more common for a plaintiff to rely on what has been described as "a convincing mosaic of circumstantial evidence," as Bagwe does here, *see Teruggi v. CIT Group/Capital Fin., Inc.*, 709 F.3d 654, 660 (7th Cir. 2013) (quotation omitted). There are three broad categories of circumstantial evidence that plaintiffs typically use to paint a picture of discrimination: "(1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at, other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; or (3) evidence that the employer offered a pretextual reason for an adverse employment action."  *Tank*, __ F.3d __, 2014 WL 3360476, at *2. Circumstantial evidence must be enough to allow a rational jury to conclude that it points "directly to a discriminatory reason" for the employer's adverse action. *Mullin v. Temco Mach., Inc.*, 732 F.3d 772, 777 (7th Cir. 2013) (quotation omitted).

Although there is no question that Bagwe's termination is an adverse action sufficient to support a discrimination claim, the parties disagree over whether the defendants' decision to place her on a PIP also qualifies as an adverse action. In the context of a discrimination claim, an adverse action must represent a "materially adverse change," such as "a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Oest*, 240 F.3d at 612-13 (internal quotations omitted). A negative performance review standing alone does not qualify. *Id.* at 613. Bagwe argues that the PIP qualifies as an adverse action because, according to her, it resulted in her being denied a raise. (R. 160, Pl.'s Resp. at 26.) But the only evidence she cites to support this contention is the fact that merit increases are determined in part based on something called an employee's MAPP score. (R. 166, Defs.' Resp. to Pl.'s Facts ¶ 9.) She points to no evidence that her PIP played into her 2009 MAPP score or otherwise directly impacted her merit increases. Accordingly, there is no evidence to distinguish the PIP from any other negative performance review. *See Langenbach v. Wal-Mart Stores, Inc.*, No. 14-1022, __ F.3d __, 2014 WL 3805439, at *4 (7th Cir. Aug. 4, 2014) (stating that PIP is "not materially adverse" and citing cases). Although evidence regarding the circumstances surrounding and motivations behind the PIP certainly will be taken into account as potential evidence of discrimination leading up to Bagwe's termination, the PIP standing alone will not be viewed as a separate adverse employment action.

Turning to the question whether Bagwe's race or national origin motivated the defendants' decision to fire her, Bagwe presents several lines of what she characterizes as circumstantial evidence of discrimination. After a careful review, the court concludes that this evidence, taken as a whole and in the light most favorable to Bagwe, is insufficient to support an inference of unlawful discrimination. *See Sylvester v. SOS Children's Vills. Ill., Inc.*, 453 F.3d 900, 903 (7th Cir. 2006) (emphasizing need to consider record as a whole at summary judgment).

Bagwe first argues that she was paid less than similarly situated individuals who reported to the same management team and held Operations Manager III positions on the AT&T account. (R. 160, Pl.'s Resp. at 13-14.) She also cites as evidence of discrimination the fact that her replacement was hired at a higher salary than her. To qualify as circumstantial evidence of discrimination under the direct method, Bagwe must show that the comparators she points to are "directly comparable" to her "in all material respects . . . with other possible explanatory variables eliminated." *See Hutt v. AbbVie Prods. LLC*, No. 13-1481, __ F.3d __, 2014 WL 3033126, at *4 (7th Cir. July 7, 2014) (internal quotation marks omitted). In other words, "the comparators must be similar enough that any differences in their treatment cannot be attributed to other variables," like race or national origin. *Silverman v. Bd. of Educ. of Chi.*, 637 F.3d 729, 742 (7th Cir. 2011). Without this requisite similarity, any proposed comparison would be meaningless.

The defendants do not dispute that when the salaries of the Operations Managers III assigned to AT&T are viewed in light of Sedgwick's geographic cost-of-living adjustments, Bagwe's salary was the lowest. (R. 166, Defs.' Resp. to Pl.'s Facts ¶ 86.) But Bagwe's reliance on that fact to show that her race or national origin explains the differences between her salary and those of other people in her position fails to pin down the similarities among the comparators with sufficient specificity. As the defendants point out, LeClaire testified that many variables went into decisions about managers' pay, including prior work experience, the challenge posed by the assigned account, and the number of direct reports. (Id. ¶ 61.) In particular, LeClaire explained that the salary of Bagwe's replacement was based on his leadership skills, level of experience, and years of management background. (Id. ¶ 88.) Bagwe has not pointed to evidence that directly contradicts her testimony, nor has she made any attempt to show that the other individuals who held her job title "had comparable experience, education, or qualifications." *See Tank*, __ F.3d __, 2014 WL 3360476, at *7. In fact, nowhere in her response does she list those comparators by name (other than her replacement) or otherwise make any attempt to demonstrate a level of similarity that would allow a reasonable jury to conclude that race and national origin are the variables that explain the differences in their compensation. *See Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 685 (7th Cir. 2014) (stating that the similarly-situated "inquiry is too fact-intensive for us to rely on conjecture alone"); *Bass*, 746 F.3d at 835 ("Without at least a name to test, the district court had no choice but to grant summary judgment."). The

Seventh Circuit has made clear that pointing to evidence that others with the same job title were paid more than the plaintiff is insufficient. *Tank*, __ F.3d __, 2014 WL 3360476, at *7. Because that is all Bagwe does here, her proposed comparison fails to support an inference that discrimination may have been a factor in her pay. *See id.*

Next Bagwe argues that there is evidence from which a reasonable jury could conclude that the defendants' explanation for her termination decision is pretextual. According to the defendants, they fired her because she exhibited poor leadership and communication skills and engaged in unprofessional behavior, especially by engaging in "email wars." Evidence of pretext qualifies as circumstantial evidence of discrimination under the direct method. *Tank*, __ F.3d __, 2014 WL 3360476, at *2. In order to show that the defendants' explanation is pretextual, Bagwe must point to evidence from which a reasonable jury could conclude that it is a lie. *See Cung Hnin*, 751 F.3d at 506. It is not enough to show that the defendants made a mistake or exercised poor business judgment. *Mullin*, 732 F.3d at 778. Rather, "the important consideration is whether the employer gave an honest explanation of its behavior." *Id.* (internal quotation omitted).

In her attempt to establish pretext Bagwe first argues that the defendants provided shifting explanations for their decision to fire her, and that a jury could infer from those shifts that they lied about their true motivation. Although "[i]nconsistent explanations by an employer can support a reasonable inference of pretext that can defeat a motion for summary judgment," *Carlson v. CSX Transp.,*

*Inc.*, Nos. 13-1944 & 13-2054, __ F.3d __, 2014 WL 3361072, at *6 (7th Cir. July 10, 2014), the supposed inconsistencies Bagwe points to here amount to nothing more than different articulations of the same rationales. In support of her pretext argument, Bagwe presents a chart quoting testimony from five Sedgwick employees involved in her termination and asserts that their explanations "vary wildly." (R. 160, Pl.'s Resp. at 19.) But the quoted explanations are actually quite consistent. The employees used phrases like "not a team player," "lack of trust in leadership team," "become a distraction," and "confrontational." (Id. at 20.) Several of the excerpts expressly cite "communication" and "trust" issues. (Id.) That these five individuals did not use identical language to describe the decision does not detract from the fact that taken as a whole, their explanations all support the idea that the decision was based on Bagwe's perceived lack of leadership, communication skills, and professionalism.

Similarly, Bagwe's attempt to argue that Sedgwick's current explanation marks a pivot from its response to her EEOC charge also rests on distinctions with no real differences. Sedgwick told the EEOC that "Bagwe was terminated because of her inability to focus on business and client issues and [her] attitude toward her supervisors, managers and co-workers had become a continuing distraction to the business unit and was interfering with everyone's ability to do their job and service their clients satisfactorily." (R. 166, Defs.' Resp. to Pl.'s Facts ¶ 101.) To demonstrate a pivot, Bagwe points to LeClaire's testimony that she knew Bagwe's issues "weren't impacting the results" for clients. (Id.) But whether specific results

actually suffered is a different question from whether Bagwe's behavior made it more difficult for her team to service their clients, as described in the EEOC response. LeClaire's concession that Bagwe's behavior had not impacted client results simply does not suggest that the EEOC response was "cooked up after the fact." *See Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 315 (7th Cir. 2011). And in any event, it is not enough to show that the defendants may have been wrong in evaluating whether Bagwe's behavior impacted her team's ability to service their clients. The question with respect to pretext is whether the employer's explanation is true, not whether it is correct. *See Mullin*, 732 F.3d at 778. Nothing in the testimony that Bagwe cites here supports her attempt to characterize the defendants' reasons as "shifting" in the way that would give rise to a reasonable inference that the defendants were lying.

Bagwe next argues that a reasonable jury could see pretext in what she describes as the defendants' failure to follow its own policies in handling her termination. This argument consists in pertinent part of the following four sentences:

> Plaintiff also presents evidence of Defendants' failure to follow its own policies. Although the facts are disputed, Plaintiff's termination was handled nothing like the termination of her successor . . . . (PSOF ¶¶ 16, 89.) Numerous other policy violations or deviations abound. (PSOF ¶ 16.) This, too, is evidence of pretext.

(R. 160, Pl.'s Resp. at 22.) Bagwe does not identify with any specificity what policies she is referencing, how her termination was handled differently than the termination of her replacement, or what "numerous other" deviations she is

referencing. Her failure to develop this argument in any meaningful way would justify deeming it waived. *See U.S. v. Thornton*, 642 F.3d 599, 606 (7th Cir. 2011). But even absent any implied waiver, she has not pointed to evidence from which a reasonable jury could conclude that the supposed variations in the defendants' application of Sedgwick's policies demonstrate pretext. Nothing in either of the two cited statements of facts references a single Sedgwick policy, let alone identifies any variance from a policy, and it is well-established that a district court is not required to scour the summary judgment record to identify evidence that can defeat a summary judgment motion or to piece together a party's factual or legal arguments for her. *See Ritchie v. Glidden Co.*, 242 F.3d 714, 723 (7th Cir. 2001); *Kirkland v. Kenny Constr.*, No. 13 CV 4115, 2014 WL 3558752, at *2 (N.D. Ill. July 18, 2014). Absent any identifiable evidence regarding the applicable policies, no reasonable jury could infer pretext stemming from Bagwe's assertion that they strayed from their policies in handling her termination.

Bagwe's assertion that the defendants handled the termination of her replacement differently from hers sounds more like a comparator argument than a pretext argument, but either way, it lacks teeth. To the extent she means to show that the defendants followed company policies in terminating her replacement but not in terminating Bagwe, the evidence she cites states only that Street believes she filled out a Termination Questionnaire and Checklist for her replacement (although she could not remember whether she did), but no one filled out that checklist for Bagwe. (R. 166, Defs.' Resp. to Pl.'s Facts ¶ 16.) Bagwe fails to point to any

evidence that Sedgwick policy required that the people involved in a termination decision complete the checklist. The defendants point to evidence that the checklist was not always used in every termination case. (Id. ¶ 13; R. 163, Pl.'s Facts, Ex. 5, Browne Dep. at 41:3-12.) Bagwe has not explained how Street's possible completion of a termination checklist for her replacement but not for her shows that he received favorable treatment. In short, Bagwe simply has not identified specific evidence from which a jury could conclude that the defendants followed required policies for her replacement but not for Bagwe, infer discrimination from the fact that no checklist was completed in her case, or conclude that this difference shows that her replacement was treated more favorably in the termination process.

To the extent Bagwe intends to show that the defendants treated her replacement more favorably than her with respect to how they handled his leadership deficiencies leading up to his termination, nothing in the evidence she cites would support a reasonable inference that Bagwe's race or national origin is behind any difference. She cites paragraph 89 from her statement of facts, which states that Papaioannou was aware of her replacement's leadership issues beginning in the spring of 2012 but did not discipline or fire him until after he made a decision that exposed Sedgwick to financial liability approximately five months later. (R. 163, Pl.'s Facts ¶ 89.) Bagwe apparently intends for a jury to infer from this timeline that Papaioannou showed more tolerance for her replacement's leadership failures than she did for Bagwe's. But the timing of her replacement's termination does not support that inference. He was fired in September 2012, less

than a year after his performance issues surfaced. (R. 162, Pl.'s Resp. to Defs.' Facts ¶ 104.) The undisputed evidence shows that Warner first alerted Papaioannou to complaints about Bagwe's leadership style back in April 2008, demonstrating that she was at least aware of discord on Bagwe's team for 17 months before recommending Bagwe's termination. (Id. ¶ 56.) Bagwe has not pointed to any evidence to dispute LeClaire's testimony that regardless of Bagwe's replacement's decision exposing Sedgwick to financial liability, she would have recommended his termination if his leadership issues had not quickly improved. (Id. ¶ 104; R. 145, LeClaire Decl. ¶ 74.) In short, nothing in the record of her replacement's tenure supports an inference that the defendants showed him greater leniency than Bagwe.

Bagwe also argues that she has evidence of what she refers to as "classic pretext" stemming from what she views as the defendants' current attempt to justify the termination decision based on facts that they did not know when the decision was made. (R. 160, Pl.'s Resp. at 23.) Specifically, she asserts that a jury could infer that the decision to fire her had been made by August 3, 2009, because that is the date that Jackson and Papaioannou exchanged emails regarding scheduling a meeting with Bagwe, but argues that Papaioannou explains the decision to fire her based partly on information she received from an employee named Rick Hernandez on August 4. Although Bagwe's brief fails to cite any evidence in support of the argument, Plaintiff's exhibit 56 shows that the email exchange about meeting Bagwe did occur on August 3, 2009. (R. 163, Pl.'s Facts,

Ex. 56.)  The defendants do not dispute that the purpose of the meeting referenced in that email was to discuss Bagwe's termination.  (R. 166, Defs.' Resp. to Pl.'s Facts ¶ 82.)  But regardless of the timing, Papaioannou does not say in her declaration that she relied on Hernandez's August 4 feedback to inform her termination recommendation.  (R. 145, Defs.' Ex. G, Papaioannou Decl. ¶ 26.)  Instead, she states that her recommendation was based on her conclusion that Bagwe's leadership and communication issues had not resolved in the months following the PIP, a conclusion informed in part by the July 2009 incident involving Warner.  (Id. ¶¶ 28-29.)

Moreover, because the information Papaioannou received from Hernandez simply echoed concerns that French, Warner, and others raised earlier about Bagwe's combative style, no reasonable jury could infer that Papaioannou cited his feedback to fabricate new reasons to justify a decision after the fact.  *See Schuster v. Lucent Techs., Inc.*, 327 F.3d 569, 579 (7th Cir. 2003) (noting that "an additional, not necessarily inconsistent reason for the employment decision, rather than an abrupt change in explanation" does not show pretext).  In that sense, the facts here present a far cry from the situation in *Futrell v. J.I. Case*, 38 F.3d 342 (7th Cir. 1994), which Bagwe points to in support of her "classic pretext" argument.  There, the court found evidence that a manager had created a catalogue of the plaintiff's shortcomings after he was fired and then "tried to make it seem as if he had kept the notes contemporaneously," could cast doubt on the validity of the employer's explanations.  *Id.* at 349.  Here, by contrast, no reasonable jury could infer that by

referencing her conversation with Hernandez in her declaration Papaioannou was "backfiling" the evidence in an attempt to justify her recommendation after the fact. *See id.* Because Bagwe points to no evidence that Papaioannou relied in particular on Hernandez's information to inform her recommendation, and even if she did, that evidence is consistent with the explanation the defendants have provided from the start, Bagwe has not shown that a reasonable jury could conclude that Papaioannou lied about Bagwe's leadership and communication deficits to try to hide a discriminatory motive. *See Schuster*, 327 F.3d at 579.

Finally, Bagwe argues that a reasonable jury could infer that her race and national origin were motivating factors in the termination decision from LeClaire's comment that she "does not like" her Indian sister-in-law and from the (disputed) claim that Papaioannou called her an "Indian bitch" on the day she was fired. (R. 160, Pl.'s Resp. at 17.) "A remark can raise an inference of discrimination when it was: (1) made by the decision-maker, (2) around the time of the decision, and (3) in reference to the adverse employment action." *Tank*, __ F.3d __, 2014 WL 3360476, at *4 (internal quotation omitted). Those qualifications are required because although bigotry has no place in any work environment, it is only actionable if there is a "real link between the bigotry and the adverse employment action." *Gorence v. Eagle Food Ctrs., Inc.*, 242 F.3d 759, 762 (7th Cir. 2001). Accordingly, derogatory remarks are only sufficient to create a triable issue of material fact regarding discrimination where they are contemporaneous with the

termination or causally connected to the termination decision process. *Oest*, 240 F.3d at 611.

LeClaire's statement regarding her sister-in-law falls far short of the criteria that can elevate an otherwise stray comment into the realm of circumstantial evidence of discriminatory intent. According to Bagwe, when she asked LeClaire how her sister-in-law was doing, LeClaire responded, "which one, the Indian?" and then said that she did not like her sister-in-law. (R. 162, Pl.'s Resp. to Defs.' Facts ¶ 72.) LeClaire said this as the two were walking toward a parking lot after a lunch at Navy Pier, outside any conversation regarding Bagwe's job or any work decision. Context matters, and alleged discriminatory remarks that happen in a casual setting outside discussions regarding the dismissal decision do not support an inference of discrimination. *Oest*, 240 F.3d at 611. Even if LeClaire had made the comment in the context of an employment discussion, her statement is too ambiguous to give rise to a reasonable inference of discriminatory intent. *See Tank*, __ F.3d __, 2014 WL 3360476, at *4; *Hutt*, __ F.3d __, 2014 WL 3033126, at *4-*5 (noting that comments reflecting "problematic hostility" are insufficient to establish discrimination).

Bagwe's claim that Papaioannou muttered "Indian bitch" as Bagwe left her office on the day of her termination is more troubling. Papaioannou denies that she said any such thing, but of course at the summary judgment phase, the court assumes the truth of Bagwe's account of their exchange. *See Arnett v. Webster*, 658 F.3d 742, 749 (7th Cir. 2011). Determining whether this comment is sufficient to

suggest that a discriminatory motive underlies Bagwe's termination is a close call. On the one hand, this offensive comment allegedly was made by a decision-maker just before Bagwe learned that she was being terminated. On the other hand, Bagwe admits that Papaioannou made the comment at the tail end of a casual conversation in which she stopped by Papaioannou's office just to say hello, rather than in the context of any employment discussion. (R. 162, Pl.'s Resp. to Defs.' Facts ¶ 100.) According to Bagwe, she heard Papaioannou mutter "Indian bitch" after she had turned her back and was walking away. (Id.) There is no evidence that Papaioannou referenced her termination during the conversation. *See Gorence*, 242 F.3d at 762 (noting that stray remarks may show discrimination where made around the time of and in reference to complained-of action). And according to Bagwe, by the time the conversation took place, the termination decision was already days old. (R. 166, Defs.' Resp. to Pl.'s Facts ¶ 82); *see Overly v. Keybank Nat'l Ass'n*, 662 F.3d 856, 865 (7th Cir. 2011) (finding that supervisor calling plaintiff a "bitch" after she resigned insufficient "to be regarded by a reasonable jury as a confession that any previous, adverse conduct was taken for a discriminatory purpose"). Although Papaioannou's comment could give rise to an inference of bias, nothing about the context surrounding the comment suggests that her bias played into the pre-existing termination decision. Nor has Bagwe pointed to any additional evidence suggesting Papaioannou either explicitly or implicitly relied on any bias related to race or national origin in recommending Bagwe's termination. *See Dass v. Chi. Bd. of Educ.*, 675 F.3d 1060, 1072 (7th Cir. 2012) (holding that the accused

official's remark that the plaintiff "'should look for another job on the North Side where most of the Indians go'" not enough to create a genuine factual issue as to whether the official was motivated by national origin discrimination).  In the absence of some link between Papaioannou's comment and the termination decision, no reasonable jury could reasonably infer that Papaioannou's bias informed the termination decision.  *See Adams*, 324 F.3d at 939 (noting that bigotry is actionable only if linked to the adverse employment action).

At the end of the day, in the absence of other evidence linking the termination decision to Bagwe's race or national origin, Papaioannou's comment standing alone is not enough to constitute circumstantial evidence of discrimination.  *See Perez v. Thorntons, Inc.*, 731 F.3d 699, 709 (7th Cir. 2013) ("Standing alone, biased comments do not establish discriminatory motive unless they were [made] by the decision maker and can be connected to the decision.").  Rather than presenting a convincing mosaic of circumstantial evidence, Bagwe has presented "only one 'bit' or 'piece'."  *See Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 644 (7th Cir. 2013).  Because none of the other evidence Bagwe has marshalled supports an inference of discriminatory motive, Papaioannou's singular comment is not enough to point to the conclusion that the defendants were unlawfully motivated when they decided to fire her.  *See Langenbach*, __ F.3d __, 2014 WL 3805439, at *4.  Accordingly, she is not entitled to avoid summary judgment on her race and national origin discrimination claims under the direct method.

## 2. Indirect Method

To establish her discrimination claims under the indirect method of proof, Bagwe has the initial burden of making out a prima facie case that: (1) she is a member of a protected class; (2) she performed according to the defendants' reasonable expectations; (3) she nonetheless suffered an adverse employment action; and (4) similarly situated non-Asian American or non-Indian American employees were treated more favorably. *See Morgan*, 724 F.3d at 996. The first and third prongs are not in dispute here. And in cases like this, where the people judging a plaintiff's performance are the ones accused of discrimination, the second prong drops out of the analysis. *See Oest*, 240 F.3d at 612 n.3. Accordingly, the court's analysis begins with the fourth prong.

To show that others outside her class were treated better than her Bagwe points to her replacement. Her one-sentence argument is that the defendants treated her replacement more favorably than her because despite similar leadership issues, he was not fired until he struggled to learn how to handle long-term disability claims and engaged in conduct that cost Sedgwick money. (R. 160, Pl.'s Resp. at 23.) But the similarly-situated analysis is the same under the indirect method as it is under the direct method, *see Langenbach*, __ F.3d __, 2014 WL 3805439, at * 7, and for the same reasons explained above, Bagwe has failed to show that the events leading up to the replacement's termination support an inference that he was treated more favorably than she was because of her race or national origin. Neither comparing the reasons for their terminations nor the

length of time it took for the defendants to fire the replacement supports an inference that the replacement received greater leniency for similar failures.

Even if Bagwe had met her burden with respect to the prima facie case, because the defendants articulated legitimate, nondiscriminatory reasons for firing her, the burden shifts back to Bagwe to show that the reason is pretextual. *See Morgan*, 724 F.3d at 996. But Bagwe relies here on the same pretext evidence that the court found lacking under the direct method. As explained above, that evidence is insufficient to show that the defendants lied in citing Bagwe's leadership, communication, and professionalism deficits as the reasons behind their decision to fire her. Because the evidence Bagwe has marshalled falls short under both the direct and indirect methods of proof, the defendants are entitled to summary judgment on her race and national origin discrimination claim.

## C. Bagwe's Claims of Retaliation

Bagwe also claims that the defendants retaliated against her for complaining about workplace discrimination by placing her on the PIP, firing her, and by describing her as "a problem" to a potential employer. Title VII prohibits an employer from retaliating against an employee for engaging in protected activity, such as complaining about discrimination in the workplace. 42 U.S.C. § 2000e-3; *Cung Hnin*, 751 F.3d at 507. Unlike the status-based discrimination claims, which require a showing that discriminatory intent was a motivating factor in an employer's decision, retaliation claims require the application of a more demanding but-for causation standard. *See Univ. of Tex. Sw. Med. Ctr.*, 133 S.Ct. at 2528.

1. **Direct Method**

For Bagwe to establish her retaliation claim under the direct method, she must point to evidence from which a reasonable jury could conclude that she engaged in statutorily protected activity, suffered an adverse action, and that the two are causally connected. *See Cung Hnin*, 751 F.3d at 508. For purposes of retaliation, an adverse action is anything that would dissuade a reasonable employee from complaining about discrimination. *Burlington N. Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). In this context an action can be materially adverse regardless of whether it affects the terms or conditions of the plaintiff's employment. *Cung Hnin*, 751 F.3d at 508 n.2. The adverse actions Bagwe points to in support of her retaliation claim include her PIP, her termination, and what she describes as the defendants' post-termination interference with her attempts to find new employment. But even in the retaliation context, the Seventh Circuit has held that a PIP does not qualify as a materially adverse action. *See Langenbach*, __ F.3d __, 2014 WL 3805439, at * 4; *Cullom v. Brown*, 209 F.3d 1035, 1041 (7th Cir. 2000).

Although a negative reference or post-employment blacklisting can qualify as materially adverse acts of retaliation, *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997) (holding that acts of retaliation against former employees are actionable); *Veprinsky v. Fluor Daniel, Inc.*, 87 F.3d 881, 888 (7th Cir. 1996), the defendants argue that the only evidence Bagwe has presented of actionable post-termination conduct constitutes inadmissible hearsay. The court agrees. Bagwe's argument rests solely on her assertion that an unidentified person at Sedgwick interfered with

her attempt to gain employment at a company called Matrix Absence Management. (R. 160, Pl.'s Resp. at 27.) In support of that assertion, she cites the declaration of Matrix employee Kristi Pease, who states that in late 2009 or early 2010 she interviewed Bagwe for a senior management position. (R. 163, Pl.'s Facts, Ex. 59, Pease Decl. ¶¶ 5-6.) According to Pease, after the interview she told Matrix's CEO that she wanted to hire Bagwe, and that Bagwe had worked previously at Sedgwick. (Id. ¶¶ 4, 7.) Before Pease could schedule Bagwe for an onsite interview the CEO emailed Pease and told her that he had just spoken to someone from Sedgwick and based on that conversation he asked Pease not to hire Bagwe. (Id. ¶ 8.) According to the declaration, the CEO told Pease that the Sedgwick person had told him that Bagwe was a good performer who had become "a problem" after she was promoted. (Id.)

Pease's statement is inadmissible both because it lacks foundation, in that it does not identify the source of the negative reference, and because it constitutes hearsay. Bagwe argues that Pease's recounting of what her CEO told her about his conversation with an unidentified Sedgwick employee is not hearsay because it is offered not for the truth of the matter asserted—that Bagwe was "a problem"—but rather for its effect on the listener, the CEO. (R. 160, Pl.'s Resp. at 27 n.11.) But the statement clearly *is* submitted for its truth: that some unidentified Sedgwick employee gave the CEO a negative reference for Bagwe. *See Malin*, __ F.3d __, 2014 WL 3896175, at *1 (noting that supervisor's report that his boss instructed him to stop plaintiff from lodging harassment complaint "fits squarely" within hearsay

definition). As an out-of-court statement submitted for the truth of the matter asserted, what the CEO told Pease about what someone else told him is hearsay. Fed. R. Evid. 801(c). "Where a plaintiff attempts to introduce the testimony of an individual who did not personally witness the alleged defamatory statement but was later told by another that the statement was made, such testimony is rejected as hearsay." *Schindler v.* Seiler, 474 F.3d 1008, 1011 (7th Cir. 2007). That is exactly what Bagwe attempts to do here.

Bagwe argues alternatively that the statement fits into the hearsay exception for "present sense impressions." *See* Fed. R. Evid. 803(1). "The theory underlying the present sense impression exception 'is that substantial contemporaneity of event and statement negate the likelihood of deliberate or conscious misrepresentation.'" *United States v. Boyce*, 742 F.3d 792, 796 (7th Cir. 2014) (quoting Fed. R. Evid. 803 advisory committee's note). Rule 803(1) covers a statement "describing or explaining an event or condition, made while or immediately after the declarant perceived it." To qualify under this exception, the statement must meet three criteria: (1) it must describe the event "without calculated narration"; (2) the speaker must have personally perceived the described event; and (3) the statement must have been made while the event was unfolding or immediately after. *Schindler*, 474 F.3d at 1011. Bagwe argues that the CEO's statement meets these criteria because he wrote in his email to Pease that he had "just" spoken with the Sedgwick employee when he emailed her to convey that he had been told Bagwe was a problem. But even if that were enough to show

immediacy, the CEO's email was a calculated narration drafted for a specific reason, to prevent Pease from hiring Bagwe. Accordingly, it does not qualify under the present sense impression exception to the hearsay rule. *See id.* at 1011-12. Because it is well-established that a plaintiff cannot rely on inadmissible hearsay to defeat a motion for summary judgment, *see MMG Fin. Corp. v. Midwest Amusements Park, LLC*, 630 F.3d 651, 656 (7th Cir. 2011), Bagwe has not demonstrated that a genuine issue of fact exists with respect to whether the defendants engaged in post-termination retaliation. Accordingly, the question for the court is narrowed to whether she was fired in retaliation for engaging in protected activity.

In her response brief, Bagwe cites two examples of what she views as direct evidence of retaliation. First, she points to the language in the PIP which she characterizes as ascribing a "lack of judgment" to her accusation that Coyle made discriminatory comments about other colleagues. (R. 160, Pl.'s Resp. at 15.) But her argument rests on a mischaracterization of the PIP, which ascribes a lack of judgment not to Bagwe's decision to complain about Coyle's behavior, but rather to her failure to bring it up immediately or to provide relevant details. Specifically, Papaioannou relayed French's disappointment that Bagwe complained about Coyle's behavior only months or a year after it had happened, and even then, without providing any specifics about what Coyle said or to whom.[2] (R. 145, Defs.'

---

[2] It should be noted that despite highlighting in her fact statements that French sent Coyle an email about Bagwe saying the "gloves are off," in her brief Bagwe does not point to that as circumstantial evidence of retaliation. Nor does Bagwe

Facts, Ex. O, Bagwe Dep. Ex. 17 at Sedgwick 1226.) She also criticized Bagwe for bringing up another instance in which Coyle made a derogatory comment about a colleague's sexuality over a year after it happened, noting that "it was your role and responsibility to address the issues at that time and not a year later." (Id. at Sedgwick 1227.) In other words, on its face the PIP criticizes Bagwe for *not* complaining about discrimination in a timely and professional manner. Accordingly, no reasonable jury could conclude that this aspect of the PIP constitutes direct evidence of retaliation.

The second fact Bagwe characterizes as direct evidence of retaliation is Browne's testimony that the Colleague Resources investigation into Bagwe's complaints included an investigation of Bagwe's office work relationships, the results of which led Browne to approve her termination. (R. 160, Pl.'s Resp. at 15-16.) Bagwe asserts without explanation that this testimony "directly ties her protected activities to the decisions at issue." (Id. at 16.) It is unclear why Bagwe considers an exploration of office work relationships inconsistent with or an "expansion" of an investigation into her allegations that she was discriminated against and harassed at work. (R. 166, Defs.' Resp. to Pl.'s Facts ¶ 48.) It also is unclear how any employer could evaluate the merits of such charges without understanding the relationship dynamics involved. Bagwe's theory appears to be that because colleagues interviewed in the course of an investigation into her

---

argue either that French was a decision-maker with respect to her termination or that he had a retaliatory motive that could be imputed to Papaioannou or LeClaire under a cat's paw theory. *See Nichols*, 755 F.3d at 600.

discrimination complaints said things that reflected negatively on her leadership skills and collegiality, and because Browne did not ignore that information in deciding to approve LeClaire and Papaioannou's termination recommendation, her termination is causally connected to her protected activity. (Id. ¶ 79.) But she cites no legal support suggesting that employers must compartmentalize information about an employee's performance issues just because they emerge in the course of a discrimination investigation. If anything, the fact that Browne relied on colleagues' complaints about their work relationships with Bagwe in terminating her supports the defendants' position that her leadership and communication problems were at the heart of the termination decision. Accordingly, the court disagrees with Bagwe's assertion that the investigation's exploration of her office work relationships constitutes direct evidence of retaliation.

Turning to Bagwe's circumstantial evidence, because she did not address her retaliation and discrimination claims separately, the court is again left to sift through her list of evidence to determine which evidence she views as demonstrating a causal connection between her discrimination complaints and her termination. That evidence includes the same pretext evidence that she submitted in support of her discrimination claim. For the same reasons that evidence is insufficient to show the defendants were trying to hide a discriminatory motive, it fails to support the inference that they had a retaliatory motive.

The only additional circumstantial evidence Bagwe cites in her attempt to demonstrate retaliation relates to her argument that the timing of Bagwe's PIP and

termination are suspicious. Bagwe first asserts that she told Simpson in Colleague Resources that she was being discriminated against sometime in 2008, and that a reasonable jury could infer that Simpson would have informed Papaioannou and LeClaire of those allegations at the time they were made. (R. 160, Pl.'s Resp. at 14.) She cites no evidence that Simpson actually conveyed that information to Papaioannou and LeClaire at the time. Her speculation as to what might have happened is not sufficient to create a genuine issue of fact as to the timing of her supervisors' awareness that she had engaged in protected activity. *See Nichols*, 755 F.3d at 599.

There is no dispute, however, that Bagwe brought up discriminatory comments that Coyle had made about other employees in a conversation with her and French in January 2009, and that French had alerted LeClaire and Papaioannou to those complaints by February 25, 2009. LeClaire and Papaioannou prepared the PIP just over two weeks later, on March 12, 2009. Similarly, Bagwe was fired nine days after she requested in a follow-up email that Simpson provide a more specific response to her complaints about her pay. (R. 163, Pl.'s Facts, Ex. 44.) The timing is indeed close. But it is not suspicious. Bagwe argues that the defendants decided to fire her on August 3, 2009. Accordingly, her August 4 follow-up email could not have been a factor in the termination decision. As for the PIP, LeClaire and Papaioannou prepared it partly in response to the information French provided about Bagwe's negative interactions with colleagues. *See Tank*, __ F.3d __, 2014 WL 3360476, at *3 (timing of investigation into complaints about plaintiff

launched two days after plaintiff complained of discrimination not suspicious). But even if the timing raised a suspicion of causation, that alone is not a sturdy enough hook from which to hang Bagwe's entire retaliation claim. *See Nichols*, 755 F.3d at 605. That is because "[s]uspicious timing alone is rarely sufficient to create a triable issue. . . . It is clear that mere temporal proximity is not enough to establish a genuine issue of material fact." *Hutt*, __ F.3d __, 2014 WL 3033126, at *5 (internal quotation and citation omitted). Even viewed as a whole, the evidence presented in response to the defendants' motion is insufficient to survive summary judgment on her retaliation claim under the direct method.

### 2. Indirect Method

To establish a retaliation claim under the indirect method, a plaintiff must make out a similar prima facie case as exists for a discrimination claim, although the first prong is tweaked to ensure that she engaged in statutorily protected activity and the fourth requires a comparison to employees who did not engage in such protected activities and were treated more favorably. *See Hutt*, __ F.3d __, 2014 WL 3033126, at *6. Bagwe has made no independent argument as to why her retaliation claim should survive under the indirect method. Because the evidence she seems to rely on to show she was treated less favorably than similarly situated employees who did not engage in protected activity is the same that the court found lacking with respect to her status-based discrimination claims, she has failed to make out a prima facie case of retaliation as well. The same is true for her evidence of pretext. In short, Bagwe has neither argued that her retaliation claim should

survive under this method of proof for reasons other than those that the court rejected with respect to her discrimination claim, nor pointed to new evidence that would meet her burden of proof with respect to the retaliation claim. Accordingly, she is not entitled to avoid summary judgment on her retaliation claim.

## Conclusion

For the foregoing reasons, the defendants' motion for summary judgment is granted. Bagwe's defamation claim is dismissed with prejudice in light of her decision to withdraw prosecution of that claim.

**ENTER:**

Young B. Kim
United States Magistrate Judge